**STATE of Tennessee, Appellee,**

v.

**Paul Gregory HOUSE, Appellant.**

Supreme Court of Tennessee,
at Knoxville.

Dec. 14, 1987.

**142** 

Charles C. Burks, Jr., Knoxville, for appellant.

W.J. Michael Cody, Atty. Gen. and Reporter, Gordon W. Smith, Asst. Atty. Gen., Nashville, for appellee.

## OPINION

HARBISON, Chief Justice.

Appellant was convicted of murder in the first degree and sentenced to death by electrocution. After review of the entire record and after considering all of the issues raised by counsel for appellant, we affirm the conviction and the sentence.

The victim of the homicide was Mrs. Carolyn Muncey, who lived with her husband and two young children on Ridgecrest Road in rural Union County, Tennessee. Mrs. Muncey was in her late twenties, and her children were about eight and ten years old at the time of her death on July 13, 1985.

In March 1985 appellant Paul Gregory House was released from prison in Utah and moved to the rural community in which the Muncey family lived. There he resided with his mother and step-father for several weeks, but in June he moved into a trailer occupied by his girl friend, Donna Turner, which was located about two miles from the Muncey home. Appellant did not own an automobile; but he was permitted to drive his mother's car from time to time, and he also drove Ms. Turner's car on some occasions.

Other than doing occasional farm work for his stepfather, appellant does not appear to have been regularly employed. He did not testify at trial at either the guilt phase or the sentencing hearing. He was shown to have had one prior conviction for aggravated sexual assault, a charge to which he pled guilty on March 16, 1981 in

Salt Lake County, Utah. Apparently he was placed on parole in that state, and supervision of his parole was transferred to Tennessee when he returned to this state. He was approximately twenty-three years old at the time of the homicide in this case.

Mrs. Muncey disappeared from her home in the late evening of Saturday, July 13, 1985. Her badly beaten body was found on the following afternoon at about 3 p.m., lying partially concealed in a brush pile about 100 yards from her home.

Apparently the husband of the victim was not at home during the early part of the evening of July 13. Mrs. Muncey and her children visited a neighbor and left at about 9:30 p.m. to return to their home. Later the older child, Laura, awoke. She testified that she heard a voice which sounded like her grandfather making inquiry about her father. She also heard someone tell her mother that her father had been in a wreck near the creek. She heard her mother sobbing or crying as she left the house. When her mother did not return, the two children went to look for her at neighboring homes. Not finding her, they returned home and waited until their father arrived. Discovering that his wife was missing, he took the children back to the home of the neighbor where they had visited earlier in the evening and then called for members of his family to look for his wife.

When the body of Mrs. Muncey was discovered the next afternoon, she was dressed in her nightgown, housecoat and underclothing. Her body was badly bruised, and there were abrasions and blood giving every evidence that she had been in a fierce struggle. Apparently a severe blow to her left forehead had caused her death. It appeared, however, that she had also been partially strangled. A pathologist testified that the blow to her left forehead caused a concussion and hemorrhage to the right side of the brain from which she died, probably one to two hours after being struck. He testified that she probably would have been unconscious after having been struck. He estimated the time of her death at between 9 p.m. to 11

p.m. on Saturday, July 13, but emphasized that this was at best a rough estimate.

Appellant never confessed to any part in the homicide, and the testimony linking him to it was circumstantial. There was evidence showing that he knew Mr. and Mrs. Muncey and had been with them socially on a few occasions. Through defense proof there was testimony that Mrs. Muncey and her husband had been having marital difficulties and that she had been contemplating leaving him. There was no evidence to indicate that the appellant was aware of that situation, however, or that there had been any previous romantic or sexual relationship between him and the victim.

On the afternoon of Sunday, July 14, 1985, two witnesses saw the appellant emerge from a creek bank at the side of Ridgecrest Road at the site where Mrs. Muncey's body was later found concealed in the underbrush. He was wiping his hands with a dark cloth and was walking toward a white Plymouth automobile, parked on the opposite side of the road, belonging to his girl friend Donna Turner. The two witnesses spoke briefly to appellant, all of them discussing the fact that Mrs. Muncey had disappeared. Later the two witnesses became suspicious of what they had observed and returned to the point where they had seen appellant emerge from the embankment. Looking down the bank, they found the partially concealed body of Mrs. Muncey. They promptly notified the sheriff.

Appellant later admitted that he had been in the area but denied that he had seen the body of Mrs. Muncey or had any knowledge of its presence. The dark rag which he had been using when first seen was never produced. It was the theory of the State, however, that this was a dark "tank top" or jersey which appellant was shown to have been wearing on the previous evening, July 13.

Appellant gave two statements to investigating officers in which he denied being involved in the homicide. In both of these statements he stated that he had been at Ms. Turner's trailer the entire evening of July 13 and that he had not left until the next afternoon when he went to look for Hubert Muncey after learning of the disappearance of the latter's wife.

On Sunday afternoon various witness observed that appellant had numerous scratches and bruises on his arms, hands and body, there being an especially significant bruise on the knuckle of his right ring finger. Appellant explained that these injuries had been sustained innocently earlier during the week, but when Ms. Turner was called as a witness, she said that she had not observed them prior to the evening of July 13. Appellant also told investigators that he was wearing the same clothes on Sunday, July 14 as he had been wearing the previous evening. It was later discovered, however, that a pair of blue jeans which he had been wearing on the night of the murder was concealed in the bottom of the clothes hamper at Ms. Turner's trailer. These trousers were bloodstained, and scientific evidence revealed that the stains were human blood having characteristics consistent with the blood of Mrs. Muncey and inconsistent with appellant's own blood. Scientific tests also showed that fibers from these trousers were consistent with fibers found on the clothing of the victim. There were also found on her nightgown and underclothing some spots of semen stain from a male secretor of the same general type as appellant.

Some of the most damaging evidence against appellant was given by his girl friend, Ms. Turner. She at first told investigators that he had not left the trailer during the course of the evening of July 13. Later, however, she modified this testimony to state that he had been in the trailer until about 10:45 p.m. at which time he left to take a walk. She stated that he did not take her automobile. When he returned an hour or so later, he was panting, hot and exhausted. He was no longer wearing either his blue jersey or his tennis shoes. The shoes were later found in an area different from the place where appellant told her he had lost them.

Appellant told Ms. Turner that he had thrown away the navy blue tank top because it had been torn when he was as-

saulted by some persons who tried to kill him. It was after the appellant's return to the trailer that Ms. Turner first noticed the bruises and abrasions on his hands referred to previously.

Appellant's mother testified that he had not used her automobile on Saturday evening. She testified that during Saturday and Sunday she had been planning to separate from appellant's stepfather and that appellant had been assisting her in her preparations for moving.

At the sentencing hearing the State proved appellant's prior conviction for aggravated sexual assault. Appellant's parents testified that he came from a broken home and had been subjected to stress as a result of that experience. Appellant's mother also testified that in the interval between the guilt trial and the sentencing hearing appellant had attempted suicide. She read into evidence a letter which he had written to her denying his involvement in the homicide. Apparently he had cut his wrists while in the jail awaiting the sentencing hearing, but the degree and extent of the injuries were not detailed in evidence. They do not appear to have been serious and did not prevent his attending the sentencing hearing.

Although the evidence against appellant was circumstantial, it was quite strong. Particularly incriminating was the testimony that he had emerged from an embankment where the body was found, wiping his hands on a dark cloth, without disclosing to anyone the presence of the body. Damaging also were the discovery of his bloodstained trousers and the testimony of Ms. Turner, which a trier of fact could have found sufficient to demolish his alibi and to demonstrate that he had been in a heavy struggle near the time when the homicide must have occurred.[1] A classic case for determination by a jury was presented, and the evidence clearly is sufficient to support the conviction.

Following the sentencing hearing, the jury imposed the death penalty. In their verdict they found that the State had established three aggravating circumstances, these being: (1) appellant had previously been convicted of a felony involving the use or threat of violence to the person; (2) the homicide was especially heinous, atrocious, or cruel; and (3) it was committed while appellant was committing or attempting to commit or fleeing from the commission of rape or kidnapping. T.C.A. § 39–2–203(i)(2), (5), and (7).

There was ample evidence to support all of these findings and to support the conclusion of the jury that no mitigating circumstances had been established which would outweigh the aggravating circumstances. Certainly the sentence of death was not disproportionate to that imposed in other cases in view of the violent and brutal nature of the homicide shown in this record.

Counsel for appellant has raised a number of legal issues, all of which we have considered but do not find sufficient to warrant a reversal of the conviction or the sentence. A broad attack has been made upon the constitutionality of the Tennessee death penalty statutes, but practically all of the issues raised by counsel have been previously considered and rejected by this Court in extensive reported opinions. We do not deem it necessary here to repeat citations dealing with these constitutional issues. Appellant insists that T.C.A. § 39–2–203(d) permits the State to make final closing argument to the jury in the penalty phase, and therefore, deprives the accused of due process of law and the effective assistance of counsel. We find no merit in this contention, especially in view of our repeated holdings that the burden of proof to establish aggravating circumstances beyond a reasonable doubt rests upon the State.

■ Counsel for appellant also questions the excusing of four prospective jurors upon challenge for cause made by the State. Each of these persons stated that he or she could not consider the imposition

---

1. After returning from his "walk," appellant suggested marriage to Ms. Turner for the first time in their relationship. It was at least arguable that he thought by this means her testimony could be rendered inadmissible by the husband-wife privilege.

of the death penalty under any circumstances. We find no error in their being excused. *See Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); *State v. Harrington,* 627 S.W.2d 345 (Tenn.1981).

■ One of the issues most seriously pursued on appeal is the alleged failure of the State properly to allow appellant to test certain evidence prior to trial. Alternatively it is argued that the trial judge should have suppressed the state's evidence concerning the bloodstains on appellant's trousers.

The blue jeans on which bloodstains were found were discovered in the trailer of Ms. Turner on Monday, July 15, 1985. On July 17, they were transported to the F.B.I. Laboratory in Washington for blood comparison analysis, together with a sample of blood drawn from the body of the victim. On that same date an F.B.I. agent informed Union County law enforcement officials that initial tests showed that the bloodstains on the blue jeans were of human origin. Appellant was not arrested until that information had been given to local authorities.

As a part of the testing of the blue jeans, portions of them were cut out and destroyed. On July 26, 1985, defense counsel filed a motion in the General Sessions Court for samples of specimens of any physical evidence on which the State or its agents performed any scientific tests and requested notice of any destructive testing. When a preliminary hearing was held on August 9, the State acknowledged receipt of this motion and stated that some of the tests would consume parts of the trousers. Although one F.B.I. agent testified that he had no further need for the blue jeans themselves after July 17, further tests were performed by other persons on other materials sent to the laboratory. Blood samples from appellant were taken on July 18 and sent to the F.B.I. The F.B.I did not

return the blue jeans and other evidence submitted to it until some time in September 1985. During that time the blue jeans had been held by the F.B.I. under refrigeration to prevent deterioration of blood stains as much as possible.

Defense counsel was notified early in October that the trousers were available for examination or testing by an independent expert of his selection. The defense did not arrange to take them from the custody of the State, however, until October 29. Some tests were attempted on October 31, and others were made about a week later. An expert witness for the defense stated that blood stains remaining on the blue jeans had deteriorated by that time so that he was not able to make any meaningful independent tests.[2] It appears, however, that this expert had kept the trousers unrefrigerated, in a file drawer, for some period of time before undertaking some of his tests.

It does not appear that the State deliberately withheld the trousers from inspection or testing by the defense. No serious question has been raised concerning the reliability of the tests conducted by the F.B.I. or of the results thereof. There is no more than a suggestion that independent tests might have been significant. All witnesses agreed that the chemistry of blood specimens on clothing changes with the passage of time, and no question has been made but that it was necessary for the F.B.I. agents to take specimens of the trousers themselves and to cut them out in order to conduct the tests which initially led to the arrest of the appellant.

Rule 16(a)(1)(C), Tennessee Rules of Criminal Procedure, provides:

> "Upon request of the defendant, the state shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the

---

**2.** The expert admitted that he could still have tested the stains to determine whether they consisted of human blood or animal blood. Obviously there was no way for him to compare the stains with blood of the victim since she had died, and the only vial of her blood available was used by the F.B.I. before appellant was even arrested. At no time has it been contended that the stains were appellant's own blood.

state, and which are material to the preparation of his defense or are intended for use by the state as evidence in chief at the trial, or were obtained from or belong to the defendant."

The record does not disclose any refusal by the State to provide its test results to the defense or to make the trousers themselves available for testing. Reasonable steps were taken to preserve the material.

At the time of appellant's initial request on July 26, 1985, there had not even been a preliminary hearing. The matter was then raised at the preliminary hearing itself, following which appellant was indicted on September 23. The materials were made available to appellant for further testing within a reasonable time after the return of the indictment. Under the circumstances we find no reversible error in the refusal of the trial judge to suppress the evidence of the blood tests conducted by the F.B.I. or in the failure of the State to make the materials available to appellant at an earlier date.

In the case of *State v. Gaddis*, 530 S.W.2d 64 (Tenn.1975), this Court held that an accused may be entitled to a sample of a controlled substance to have an independent analysis made by his own expert. The same rule applies under the Rules of Criminal Procedure which were subsequently adopted.

Although the *Gaddis* case only involved controlled substances, the principles announced therein and followed in the Rules of Criminal Procedure are not necessarily limited to that particular type of case. *See Smith v. State*, 566 S.W.2d 553, 559 (Tenn. Crim.App.1978).

Until the accused in this case had been indicted, on September 23, 1985, it would have been difficult and almost impracticable for the judge of the court in which the case was tried to have dealt with this matter. There is no showing of deliberate delay by the State or the F.B.I. prior to that time, and the matter was handled with reasonable dispatch after the indictment was returned. The record is conjectural at best as to whether any significant independent test could have been performed after

the indictment was returned. In the absence of evidence of deliberate obstruction or delay by the State prior to that time, we are of the opinion that the trial court was correct in not suppressing the evidence offered by the State of the results which were conducted on its behalf.

It should be noted that at least a part of the elapsed time involved was attributable as much to the defense or its expert as to the State. The issue in this case is not one of obliteration or destruction of the only available sample, but merely one of delay in delivering the remaining sample to the accused. The record indicates that there were ample stains remaining on the trousers after the F.B.I. had conducted its tests but, as stated previously, it is entirely a matter of speculation as to when the remaining samples had undergone sufficient chemical change by passage of time to render impracticable certain specified tests concerning enzymes sought the defense. As previously stated, some types of tests could have been performed, but appellant's expert chose not to pursue them.

Cases from other jurisdictions have reached differing conclusions regarding the destruction or consumption of blood samples and other types of evidence. Suppression of the State's evidence is a drastic remedy, usually imposed only where the State has clearly suppressed or destroyed evidence known to be favorable to the accused or has displayed bad faith or deliberate misconduct in not furnishing samples to the defense. *See generally*, Annot., 40 A.L.R. 4th 594, 612–616 (1985); *see also*, *State v. James*, 688 S.W.2d 463, 466 (Tenn. Crim.App.1984).

Appellant insists that in closing argument in the guilt phase of the trial the District Attorney improperly commented upon the fact that the appellant did not testify in his own behalf. Our examination of the arguments reveals that the State did no more than emphasize that its evidence concerning the presence of incriminating bloodstains on the trousers of appellant was not contradicted or explained. Not only was there an absence of any objection to this argument, but it also clearly ap-

pears that the comments were made in response to arguments advanced by counsel for appellant. The issue is without merit. *See Schweizer v. State,* 217 Tenn. 569, 399 S.W.2d 743 (1966); *State v. Coury,* 697 S.W.2d 373 (Tenn.Crim.App.1985).

In his next issue counsel for appellant contends that the jury instructions with respect to malice at the guilt trial improperly shifted the burden of proof to the defense, contrary to *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) and *Francis v. Franklin,* 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). We have examined the charge, in which the word "presumption" was omitted and the word "inferred" was substituted. As thus revised, as suggested by this Court in *State v. Bolin,* 678 S.W.2d 40 (Tenn.1984), the charge was not susceptible, in our opinion, to any understanding or construction that the burden of proof on the issue of malice was shifted to the accused. Further, with respect to this element of the crime, any error in the instruction would clearly have been harmless beyond a reasonable doubt in view of the brutality and heinousness with which the homicide was accompanied.

■ Appellant assigns as error the refusal of the trial court to suppress the statements which he made in response to interrogation on July 14 and 15, 1985. A full suppression hearing was conducted. This revealed that the accused was not in custody when either of the statements was made. Both were taken before he was formally arrested or charged and at a time when he was only one of several persons being interrogated generally about the circumstances of the offense. On neither occasion was the accused restrained, and on both occasions he was advised that he was not under arrest but was free to leave and was not required to make any statements. Appellant did not testify at the suppression hearing and offered no evidence to contradict the testimony of the State's witnesses.

It was not until July 17, two days after the second statement, when the results of the F.B.I. tests on his trousers were received, that appellant was arrested and charged in this case.

The record supports the conclusion of the trial judge in overruling the motion to suppress.

■ In proving the prior conviction of the appellant at the sentencing hearing, the State adduced evidence as to the extent of his sentence and the fact that he was on parole. The State concedes that this testimony was irrelevant to any statutory aggravating circumstance or to any mitigating factor and that error was, therefore, committed. Under all of the circumstances, however, in our opinion the error was harmless beyond a reasonable doubt. As previously stated, three aggravating circumstances were shown, and there was almost minimal proof of any mitigating factor, so that any error with respect to this issue, in our opinion, could not have affirmatively affected the results of the hearing. This is especially true in view of the fact that the State did not make any reference in the closing argument to the length of appellant's prior sentence or to his parole status.

Counsel for appellant insists that the trial court improperly permitted the jury to consider evidence adduced at the guilt phase of the trial in considering their sentence since the State made no formal motion to adopt that evidence. Statutory provisions, however, mandate that the jury be instructed at the sentencing hearing to consider any evidence which may have been adduced at either the guilt or the sentencing hearing. T.C.A. § 39–2–203(d). The issue is without merit.

Also without merit is the contention that the State failed to give proper notice to counsel for appellant of its intention to seek the death penalty and of the aggravating circumstances upon which it would rely.

■ Appellant insists that there was an improper separation of the jurors before the sentencing hearing which entitles him to a new trial.

The record shows that after the guilt phase of the trial had been concluded, an

overnight adjournment ensued. During the evening hours three female members of the jury were seen, accompanied by a court officer, at a lounge where two of them ordered beer or a mixed drink. The officer who had the jurors in her custody testified that the three jurors remained in the lounge for less than thirty minutes and that only two of them consumed any alcoholic beverages. There was no discussion of the trial or its incidents, nor was any contact made with the jurors by any third person.

The sentencing hearing was held on the day following this incident. None of the jurors testified, nor were affidavits offered in evidence from them or from other persons at the motion for a new trial in support of this issue.

Moderate use of alcoholic beverages by jurors during a trial, which is not shown to be excessive or to affect the verdict, does not require a new trial. *See Sherman v. State*, 125 Tenn. 19, 140 S.W. 209 (1911). The testimony of the jury officer overcame any presumption of prejudice from the separation of the jurors in this case, assuming that an improper separation of the jurors could be said to have occurred. *See Gonzales v. State*, 593 S.W.2d 288 (Tenn.1980). This itself is doubtful in view of the fact that the jurors were never out of the presence of officers sworn to guard them. *See Steadman v. State*, 199 Tenn. 66, 282 S.W. 2d 777 (1955).

We have carefully examined all of the other issues raised by the appellant and find none of them sufficient to justify reversal of the conviction or the sentence. The sentence will be carried out as provided by law on the 7th day of March, 1988, unless otherwise ordered by this Court or by other proper authority.

FONES, COOPER, DROWOTA and O'BRIEN, JJ., concur.