IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
April 8, 2008 Session

**CHARLES E. JONES v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-26528    Lee V. Coffee, Judge**

**No. W2007-01086-CCA-R3-PC  - Filed October 6, 2008**

The petitioner, Charles E. Jones, was found guilty by a Shelby County Criminal Court Jury of premeditated first degree murder, and he received a sentence of life imprisonment. Subsequently, he filed a petition for post-conviction relief, alleging that his trial counsel was ineffective. The post-conviction court denied the petition, finding that the petitioner failed to prove his allegations by clear and convincing evidence. The petitioner now appeals this ruling. Upon review of the record and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J.C. MCLIN, JJ., joined.

Autumn B. Chastain, Memphis, Tennessee, for the appellant, Charles E. Jones.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Carrie Shelton and Kirby May, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

On direct appeal, this court summarized the proof adduced at trial as follows:

> On May 29, 1998, Officer Jeff Dennison of the Memphis Police Department was on patrol when he was flagged down by Hubert Sturdivant. Sturdivant advised Officer Dennison that there was a dead body in Sturdivant's house at 1357 Taylor Street in

Memphis. Officer Dennison immediately radioed for assistance and was followed to the scene by Officer Stephen Thaggard. When the officers arrived at the scene, they saw broken glass on the steps and porch of the house. As the officers stepped onto the front porch, the door opened and the [petitioner] stood in the doorway.

When the [petitioner] opened the door, the officers were able to see a dead body rolled up in carpet lying on the living room floor. Officer Dennison immediately ordered the [petitioner] to get down, then handcuffed him, and placed him in the back of Officer Thaggard's car. Both officers observed that the [petitioner] was calm during the entire episode and never appeared to be upset. The [petitioner] had scratches on his neck, blood splatters on his left ear, a scratch on his check, blood splatters in his hair, and a cut on his finger.

Officer Thaggard proceeded into the house. He testified at trial that the victim's bloody head was sticking out of the carpet. He saw blood splatters in the living room, on the shades, on the floor, "everywhere-it's blood everywhere." In the dining area, he saw blood on the floor and marks on the floor that indicated that something had been dragged across the area. Next to the victim's body, Officer Thaggard discovered a bucket of soapy water with a rag in it. He noted that the water was red, as if discolored by blood. A garbage can in the room contained broken glass and blood.

The [petitioner] was taken from the scene to the Regional Medical Center (Med) for examination and treatment. Captain Joseph Eldridge of the Memphis Police Department interviewed the [petitioner] at the Med. Captain Eldridge recounted that he advised the [petitioner] of his Miranda rights and asked the [petitioner] if he wanted to give a statement. The [petitioner] answered affirmatively and responded that he had killed the victim because she had "disrespected" him and knocked his crack pipe out of his hand. Captain Eldridge did not reduce this statement to writing.

The [petitioner] was taken from the Med to the Criminal Justice Center. After again being advised of his rights, the [petitioner] gave a written statement. The [petitioner] related that he met the victim when he "went to the dope house" to buy crack cocaine. After purchasing the crack cocaine, the [petitioner] went to a store up the street and purchased beer and cigarettes. The victim, who was standing in the parking lot of the store, began following the

[petitioner]. The [petitioner] invited her to accompany him to his house. When they arrived at his house, the two drank beer and smoked "$50 dollars worth of crack." After smoking crack cocaine, the [petitioner] asked the victim to have sex with him. The victim agreed and removed her clothes. Later, the victim became angry when the [petitioner] refused to give her more crack cocaine. According to the [petitioner], the victim knocked a crack pipe from the [petitioner's] hand and they "got to wrestling."

The [petitioner] alleged that the victim had a box cutter, which she began swinging at him, and cut him on the finger. The [petitioner] insisted that he cut the victim only three times in an effort to defend himself. He admitted that during their struggle, the victim was unclothed. He claimed that, after being cut, the victim attempted to jump through a window. However, there were bars on the window and she was unable to escape. He contended that the glass from the broken window caused most of the victim's injuries.

[The petitioner claimed that when the struggle ended,] he panicked and did not know what to do with the victim. He taped the victim's ankles and wrists together and placed a garbage bag on the upper portion of her body. He then rolled the body inside a piece of carpet. Attempting to clean up the blood, he placed the victim's clothes, his clothes, a wig, and the broken glass in a garbage bag. He then walked out onto his porch and smoked a cigarette.

The [petitioner] admitted that he did not call for medical assistance for the victim or call the police. He did not know the victim's name and explained that he had never met her before the day of the incident.

Dr. O'Brian Cleary Smith, the Shelby County medical examiner, testified that the autopsy of the victim revealed eighty-three separate wounds on the victim's body. He described approximately sixty-eight stab and incised wounds to the head, neck, torso, and extremities, opining that seven of the wounds were fatal. The primary causes of death were: a stab wound through the esophagus; a stab wound through the left jugular vein; a stab wound through the subclavicula vein; a stab wound to the right lung; a stab wound involving tissues of the center of the chest; a stab wound to the left lung; and a stab wound to the back. He concluded that the wounds were consistent with injuries from a box cutter, although he acknowledged that some of the wounds could have been caused by

broken glass. However, no glass was found in any of the victim's wounds. Additionally, Dr. Smith reported that the [petitioner's] blood was tested for the presence of cocaine. Dr. Smith related that a result of .1 or .2 micrograms of cocaine per milliliter is considered normal street level usage. The [petitioner's] test results showed a level of .13 micrograms per milliliter.

State v. Charles E. Jones, No. W2000-02606-CCA-R3-CD, 2001 WL 1381270, at **1-2 (Tenn. Crim. App. at Jackson, Nov. 2, 2001). On appeal, this court affirmed the petitioner's conviction. Id.

Following this court's affirmance of his conviction, the petitioner filed a petition for post-conviction relief, alleging that his trial counsel was ineffective. Namely, the petitioner alleged that counsel failed to investigate various aspects of his case, to interview all pertinent witnesses, to file all pertinent pretrial motions, and to properly research or pursue a voluntary intoxication defense.

At the post-conviction hearing, the petitioner's trial counsel testified that the petitioner's case was originally a capital case and was assigned to the capital case attorneys in the Public Defender's Office. However, when the State elected not to pursue the death penalty, the case was reassigned to trial counsel, who also worked in the public defender's office.

Trial counsel said that prior to trial, he had inquired into the victim's arrest records "using the computer system." He conceded that he had failed to discover that the victim had prior convictions for aggravated assault, prostitution, pedestrian solicitation, and drug possession.

Trial counsel said that during trial preparation, he and the petitioner met frequently to discuss the case. Trial counsel testified that the petitioner consistently maintained that the victim's death occurred as a result of wounds she sustained while trying to escape through his windows and from the petitioner's efforts to defend himself. Trial counsel opined that the version of events the petitioner shared with him was consistent with the petitioner's written statement to police and the discovery materials.

The petitioner told trial counsel that on the day of the offense, he had worked at a warehouse. The petitioner said that he used box cutters to open boxes on the assembly line. The petitioner told trial counsel that when he got off work, he went to a crack house to purchase crack cocaine. After making the purchase, he went to a nearby convenience store to buy beer. The victim approached him and asked to share his crack cocaine in exchange for sex. The petitioner said that he and the victim went to his house where they watched a basketball game on television while drinking beer and smoking crack. After a couple of hours, the petitioner requested sex. The victim removed her clothes, and they had "brief sexual intercourse." Afterward, the victim remained unclothed. The victim asked for more crack cocaine, but the petitioner refused, saying he wanted to save the last of his crack rocks for himself.

The petitioner told trial counsel that an altercation ensued after the victim knocked a crack pipe from his hand onto the floor. The petitioner said that he pushed the victim out of the chair in which she was sitting. The victim then approached the petitioner with a box cutter, but the petitioner was able to get the weapon away from her. They wrestled, and the petitioner cut the victim once. She ran to the door, but the door was deadbolted and the petitioner had the key. The victim went to the windows on either side of the door, broke the glass, and attempted to get out. However, bars on the windows prevented her escape. The petitioner told trial counsel that the victim sustained numerous wounds from the window glass. The petitioner admitted that he "stuck" the victim with the box cutter three times. The petitioner said that the victim died at some point after her thwarted attempt to leave. Trial counsel stated that when police arrived at the scene of the crime, they took pictures of the petitioner's cuts and abrasions. Trial counsel opined that the petitioner's injuries were indicative of a "monumental struggle."

The petitioner told counsel that he got a cut on his finger while fighting with the victim. After his arrest, police took him to the hospital, and he received stitches in his finger. Counsel said that Officer Joseph Reed Eldridge testified at the preliminary hearing that he did not take a statement from the petitioner at the hospital. However, on the day of trial the State revealed that it had just learned that, while at the hospital, the petitioner told Officer Eldridge that he had killed the victim because she had disrespected him. Trial counsel said that the State disclosed the oral statement immediately upon discovery of its existence. Trial counsel testified that he spoke with the petitioner and explained that they could request a continuance to consider their strategy. However, trial counsel believed that the oral statement supported the petitioner's version of events, namely that the struggle began shortly after the victim disrespected the petitioner by knocking his crack pipe out of his hands. Although the oral statement could have been used to establish a motive for the killing, counsel said that he did not move to have the statement excluded because it was consistent with the petitioner's unwavering version of events. Trial counsel believed that the State's theory at trial was that "at some point during the infliction of the wounds . . . he premeditated to kill her." Trial counsel conceded that at trial he did not cross-examine Officer Eldridge about his failure to disclose the statement at the preliminary hearing. Trial counsel surmised that when Officer Eldridge testified at the preliminary hearing that he had not taken a statement from the petitioner at the hospital, he meant that he had not taken a written statement from the petitioner.

The petitioner told trial counsel that most of the victim's wounds were caused by her attempt to escape through the broken windows. Trial counsel noted that although the petitioner said he had removed glass from the victim's wounds after she fell to the floor, the petitioner had only a single cut to his finger. Regardless, trial counsel told the petitioner that he would "deal with" that discrepancy during trial.

Trial counsel said that he had several discussions with Dr. Smith, the medical examiner who testified regarding the victim's autopsy. He specifically asked Dr. Smith if the victim's wounds could have been caused by the broken glass. Trial counsel did not request that the glass shards found on the scene be tested for blood or tissue; however, Dr. Smith stated that the victim's wounds could have been caused by sharp glass. Trial counsel said he was surprised when Dr. Smith stated that no

glass was recovered from the victim's wounds and questioned Dr. Smith about it. Trial counsel would have said that the medical examiner's office missed the glass during the autopsy, but "that's a lot of wounds not to see any glass whatsoever." Trial counsel acknowledged that he did not interview Dr. Gunther, the medical examiner who had performed the autopsy, prior to trial because she had moved to another state. Regardless, trial counsel stated that he felt that he had thoroughly interviewed Dr. Smith and cross-examined him at trial. Further, Dr. Smith was Dr. Gunther's supervisor, and Dr. Smith was present at the autopsy.

Trial counsel acknowledged that the petitioner, in his written statement to police, maintained that he could not remember where his first swing of the box cutter struck the victim. Trial counsel asked the petitioner if he was impaired by drugs or alcohol at the time of the offense, imploring him to disclose any information that might reveal he was intoxicated and that might lead to a defense. The petitioner consistently stated that he had a "pleasant buzz" at the time of the offense, but he did not indicate that he was too impaired to think clearly. Trial counsel learned through his pretrial investigation that the petitioner had previously sought treatment for his drug addiction.

Trial counsel said that testing revealed the victim had cocaine in her system. During trial, trial counsel asked Dr. Smith about the effects of cocaine on the body. However, he did not ask about the effects of cocaine when coupled with alcohol. Trial counsel explained that he did not ask the question because the petitioner had not bought much alcohol prior to the offense and because the incident occurred two to three hours after the petitioner consumed the alcohol.

Trial counsel stated that he had requested a jury instruction on voluntary intoxication. He was surprised when the trial court said that the petitioner's statement that he was "full of dope" was insufficient to warrant the instruction. Trial counsel conceded that he could have pursued the request for the instruction more aggressively, but he believed it could have served as a tangential defense at best. Counsel said that the petitioner was not "knock down sloppy slobbering drunk or high on cocaine," and he showed the presence of mind to begin cleaning the crime scene prior to the arrival of police. Also, Officer Eldridge said that the petitioner acted "calm and collected" when police arrived on the scene.

Trial counsel testified that from the beginning of his representation, the petitioner had said that he would testify at trial. Therefore, trial counsel was "stunned" when the petitioner announced during trial that he did not want to testify.

Memphis Police officer Joseph Reed Eldridge testified that when he arrived at the scene, most of the glass was outside the residence, not inside. At the hospital, the petitioner told Officer Eldridge that he killed the victim because she disrespected him. Officer Eldridge said that he testified at the preliminary hearing that he did not take a statement from the petitioner at the hospital because he did not consider the petitioner's oral statement to be a formal, written statement. Officer Eldridge said that the petitioner did not appear to be under the influence at the hospital.

The petitioner's mother, Barbara Jones, testified that trial counsel never interviewed her

-6-

about the petitioner's drug use. However, she conceded that she did not learn of the petitioner's drug use until after he was arrested when a drug dealer came to her house seeking payment from the petitioner for drugs.

Dr. O'Brian Cleary Smith testified at the post-conviction hearing that he met with both the State and trial counsel prior to trial. During the meetings, he went over the autopsy report with them on a page-by-page basis. The autopsy report stated that the cause of death was sixty-eight "knife" wounds. Dr. Smith explained that the notation did not necessarily mean that the wounds were caused by a knife; the notation simply meant that they were "wounds of sharp force." Dr. Smith said that the autopsy report indicated that the victim had some defensive wounds. He explained that the term "defensive wound" was a term of art that was developed in forensics to indicate the injuries occurred when a person was trying to protect themselves. He said he was reluctant to use the term in front of the jury because, as a pathologist, he was not present when the wound was inflicted and could not definitively say how the wound occurred. Dr. Smith said that the medical examiner's office had been told that a box cutter was found at the scene; however, the medical examiner's office was not advised that some of the wounds were potentially made by glass. Dr. Smith opined that a "defensive wound" on the victim's hand could have been caused by holding a shard of glass.

Dr. Smith said that no glass was detected in the victim's wounds by either visual inspection or low level magnification. He stated that additional testing could have been done if it had been requested. Dr. Smith said that if glass had been found in the wounds, the glass could have been introduced when the body was rolled in the carpet that had "crumbs of glass" on it. Further, Dr. Smith noted that "the rug itself contained body fluids or tissue fluids such that finding that sort of material on a small fragment of glass in association with the rug but not the body would not have been of value." On cross-examination, he acknowledged that at trial he testified that "the type of pattern of injury that I would expect from shards of glass would not be consistent with producing the cluster type effect of the wounds with the flick marks in those three areas." Regardless, Dr. Smith stated that the some of the wounds were consistent with being made by either a glass shard or a box cutter; however, there was no indication that the wounds were made by glass.

Dr. Smith said that he discussed with trial counsel the effects of cocaine. Dr. Smith explained that the use of cocaine initially creates an "excitement phase" which is characterized by increased blood pressure and stimulation of the heart. The "excitement phase" is followed by a "crash phase" where an individual's personality becomes depressed or slowed.

The petitioner testified that he consistently told trial counsel that he had cut the victim three times with a box cutter while he was defending himself but that her death resulted from wounds she sustained when she tried to go through the windows on either side of his door. The petitioner acknowledged a history of drug abuse. However, he said that theft was the most serious crime he had ever been convicted of because of his drug addiction. The petitioner told trial counsel that since he began using crack cocaine in 1992, he had been through several drug treatment programs. The petitioner recalled, "I also explained to [trial counsel], how can one go from theft to murder, because I'm a drug addict. I get high. And he was like, it doesn't matter. He didn't want to hear anything

-7-

that I had to say." The petitioner maintained that trial counsel often told him that his suggestions were not important.

The petitioner said that the victim attacked him when he was "paranoid, spooked, and surprised." He stated that he fought back by taking away the box cutter and swinging at her with it, cutting her a total of three times. The petitioner said that after the victim attempted to get through the windows, she fell to the floor and did not respond when he asked her if she was okay. At that point, he picked glass out of her wounds, rolled her body in a rug, and started cleaning the house. The petitioner said he smoked more crack cocaine while he cleaned. He acknowledged that, although the recitation of events he gave trial counsel was very detailed, he "probably forgot" to tell trial counsel that he smoked more crack cocaine while cleaning the house. The petitioner said that he had not changed his story to help himself; he could only remember "portions" of what happened because of his intoxication.

The petitioner complained that trial counsel did not put on any proof about the petitioner's drug addiction. The petitioner said that he had planned to testify regarding his drug use. The petitioner maintained that trial counsel should have called the petitioner's roommate to testify about the petitioner's drug use.

The petitioner maintained that trial counsel should have more vigorously pursued an instruction on voluntary intoxication. The petitioner acknowledged that trial counsel requested the instruction, "but he didn't understand exactly what he was explaining" and the request was denied. The petitioner said he asked his appellate counsel to include the issue on appeal, but he was told the issue would have to be raised "[o]n the next appeal."

The petitioner said that trial counsel supplied him with copies of all discovery materials, but he did not review the materials with the petitioner. Prior to trial, he and trial counsel discussed his trial testimony. However, before voir dire of the jury, trial counsel pulled the petitioner aside and advised him not to testify because the State would bring in his prior convictions and "eat [the petitioner] alive." The petitioner acknowledged that his prior convictions included five counts of credit card fraud and one conviction for theft.

The petitioner did not know until the day of trial that the State planned to introduce a statement he allegedly made to Officer Eldridge at the hospital. The petitioner told trial counsel that he made no such statement and asked trial counsel to object to it. The petitioner also asked trial counsel to move to suppress his written statement because he made the statement while under the influence of drugs and alcohol.

The petitioner said that he asked trial counsel to do several things prior to trial, such as investigate the crime scene and ask people in the neighborhood if the victim had assaulted anyone else. However, the petitioner never received any indication that trial counsel performed the requested tasks.

-8-

The petitioner acknowledged that during his <u>Momon</u> hearing, he told the trial court that he had intended to testify but that, based upon the development of the State's proof, he no longer wanted to take the stand. The petitioner also acknowledged that he told the trial court he was satisfied with the representation of trial counsel.

The petitioner maintained that he was telling the truth at the post-conviction hearing but that trial counsel and Officer Eldridge were not being truthful.

The post-conviction court found that the petitioner was not a credible witness, stating that the petitioner "exhibited a very selective memory at the evidentiary hearing." However, the court found that trial counsel and Officer Eldridge were credible witnesses. The post-conviction court found that trial counsel and the petitioner made a tactical decision to focus on self-defense, not voluntary intoxication. Additionally, the post-conviction court found that the proof indicated that the petitioner was not intoxicated at the time of the crime or when giving his written statement to police.

The post-conviction court found that the State did not learn of the petitioner's oral statement to Officer Eldridge until the day of trial and that the State disclosed the statement as soon as it was discovered. The court further found that trial counsel made a tactical decision not to seek a continuance after learning of the statement. The post-conviction court noted that the jury rejected the petitioner's claim of self-defense, opining that the jury did so because of the strength of the State's case on the premeditation issue.

Regarding the petitioner's claim that counsel should have submitted proof about the victim's criminal history, the post-conviction court found that the petitioner did not know the victim prior to the crime; therefore, the victim's criminal history would not have been admissible to prove that the victim was the first aggressor. The post-conviction court stated that the sole proof that the victim had glass in her wounds came from the petitioner's allegations. The court stated that the lack of cuts on the petitioner's fingers and the medical examiner's failure to find glass in the victim's wounds suggested that the petitioner's version of events was improbable. Accordingly, the post-conviction court found that the petitioner failed to prove by clear and convincing evidence that trial counsel was ineffective. On appeal, the petitioner challenges this ruling.

## II. Analysis

To be successful in his claim for post-conviction relief, the petitioner must prove all factual allegations contained in his post-conviction petition by clear and convincing evidence. <u>See</u> Tenn. Code Ann. § 40-30-110(f) (2006). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" <u>State v. Holder</u>, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting <u>Hodges v. S.C. Toof & Co.</u>, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. <u>See</u> <u>Henley v.</u>

State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, we afford the post-conviction court's findings of fact the weight of a jury verdict, with such findings being conclusive on appeal absent a showing that the evidence in the record preponderates against those findings. Id. at 578.

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. Moreover,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697, 104 S. Ct. at 2069).

On appeal, the petitioner first argues that his trial counsel was ineffective for "not preparing, introducing, and arguing for an intoxication charge." The post-conviction record reflects that trial counsel requested a charge on voluntary intoxication, but the request was denied. At the post-conviction hearing, trial counsel stated that the petitioner insisted that he had a "pleasant buzz" but was not intoxicated. Moreover, Officer Eldridge testified that the petitioner did not seem intoxicated when they spoke shortly after the crime. Therefore, the post-conviction court found that there was no evidence that the petitioner was intoxicated at the time of the crime; in fact, the post-conviction court found that the evidence strongly suggested that the petitioner was in full control of his faculties when the crime was committed. Accordingly, the post-conviction court found that the petitioner suffered no prejudice by trial counsel's failure to pursue a voluntary intoxication charge. We agree with the post-conviction court.

Second, the petitioner contends that trial counsel failed to properly investigate and present

the petitioner's claim of self defense. Specifically, the petitioner notes trial counsel's failure to interview Dr. Gunther, his failure to have the glass collected at the scene tested for blood or tissue, his failure to request additional testing of the wounds to check for glass, and his failure to object to the characterization on the autopsy report of certain wounds as "defensive wounds."

The post-conviction court found that Dr. Smith's testimony comported with the information contained in the autopsy report. The record supports this finding. Further, the petitioner failed to present the testimony of Dr. Gunther at the post-conviction hearing to demonstrate how her testimony would have differed from Dr. Smith's testimony. Generally, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). We may not speculate on what benefit Dr. Gunther might have offered to the petitioner's case, nor may we guess as to what evidence further investigation may have uncovered. Id.

Regarding the petitioner's complaint that trial counsel failed to have the glass recovered at the scene tested for blood and tissue, we note that counsel testified that he interviewed Dr. Smith several times and asked about the presence of glass. Dr. Smith told counsel that there was no evidence of glass in the wounds. The post-conviction court found such a lack of glass to be "telling," finding the petitioner's version of events incredulous. We conclude that the post-conviction court did not err in finding no prejudice in this regard.

The petitioner also complains regarding trial counsel's failure to object to the characterization on the autopsy report of certain wounds as "defensive wounds." The record reflects that although Dr. Smith testified that he preferred not to use the term "defensive wound," he acknowledged that the phrase is a "term of art" commonly used by medical examiners. Dr. Smith said that in the instant case, the defensive wound on the victim's hand could have been caused by her holding a shard of sharp glass. However, there was no allegation, even from the petitioner, that the victim ever held glass. Dr. Smith acknowledged that he was questioned extensively about the wounds at trial, and he explained the wounds in detail. Accordingly, we conclude that the petitioner has failed to prove how Dr. Smith's use of the contested term prejudiced him.

Next, the petitioner maintains that trial counsel should have moved to suppress Officer Eldridge's testimony concerning the petitioner's oral statement at the hospital. The petitioner contends that the State's failure to disclose the statement prior to trial was a violation of Tennessee Rule of Criminal Procedure 16 which prejudiced the petitioner. The petitioner asserts that trial counsel's ineffectiveness in this regard was compounded by his failure to interview the police witnesses prior to trial. Further, the petitioner contends that trial counsel was ineffective by failing to move to suppress his written statement to police, contending that he was under the influence of drugs and alcohol when the statement was made.

Tennessee Rule of Criminal Procedure 16(a)(1)(A) provides that, upon request, the State must allow a defendant to inspect and copy any relevant written statements made by the defendant

which are "within the possession, custody or control of the state." At the post-conviction hearing, Officer Eldridge testified that he did not tell the State about the oral statement until the day of trial. Trial counsel testified that the State disclosed the oral statement immediately upon its discovery, and the trial court gave the defense the opportunity to consider overnight whether to seek a continuance. Trial counsel said that, after discussing the issue with the petitioner, the defense decided not to pursue a continuance. Trial counsel concluded that the oral statement was not inconsistent with the petitioner's version of events, and, after discussions with the petitioner, the petitioner said he did not want a continuance. Pursuant to Rule 16, one of the options available to the trial court if a party fails to comply with the Rule is to grant a continuance. We note that suppression of evidence upon a Rule 16 violation is a drastic remedy reserved for the most flagrant of violations. See State v. House, 743 S.W.2d 141, 146 (Tenn. 1987). Moreover, we note that trial counsel stated that he was unsure of any benefit which could have been gained by a continuance. Further, trial counsel's decision not to seek a continuance was trial strategy which, even if questionable, we will not second-guess. See State v. Hellard, 629 S.W.2d 4, 9 (Tenn. 1982). Therefore, we conclude that trial counsel was not ineffective in this regard.

Regarding the petitioner's complaints about the failure to suppress his written statement, we note that the petitioner admitted that during his Momon hearing he told the trial court that he knowingly and voluntarily gave his written statement to police. Officer Eldridge testified that the petitioner was calm and collected after the crime and that he did not appear to be under the influence of an intoxicant at the time he gave his statement. Moreover, the petitioner repeatedly told counsel that he was not intoxicated. Further, the post-conviction court stated that the petitioner's post-conviction testimony was not credible. Based upon this evidence, the post-conviction court found that trial counsel was not ineffective for failing to move to suppress the written statement. We agree. Thus, we conclude that the petitioner has failed to prove his allegations of ineffective assistance of counsel.

### III. Conclusion

Finding no reversible error, we affirm the judgment of the post-conviction court.

_____
NORMA McGEE OGLE, JUDGE

-12-