James Arthur SIKES, alias, Petitioner,

v.

STATE of Tennessee, Respondent.

Supreme Court of Tennessee.

June 16, 1975.

Ray H. Jenkins, Ray L. Jenkins, Jenkins & Jenkins, Knoxville, for petitioner.

R. A. Ashley, Jr., Atty. Gen., David L. Raybin, Asst. Atty. Gen., Nashville, for respondent.

## OPINION

COOPER, Justice.

James Arthur Sikes was convicted of first degree murder for the shotgun slaying of his seventeen year old stepson, Steve Johnson, and was sentenced to serve forty years in the penitentiary. On appeal, the Court of Criminal Appeals affirmed the conviction. This court granted certiorari for the limited purpose of considering whether the evidence was sufficient to warrant a conviction of murder in the first degree.

It is undisputed in the record that Steve Johnson died at about 8:00 p. m., eastern daylight time, on April 18, 1973, from a wound in the back caused by pellets from a 20 gauge pump shotgun fired by the defendant.

It is also undisputed in the record that the deceased had been the center of family controversy from about 4:00 p. m. until his death. The record shows that defendant, his wife, and two of his stepchildren, Steve and Darlene Johnson, returned to the Sikes' home at about 4:00 p. m. Steve began arguing with and was verbally abusive toward his mother. In the course of the argument, Steve made the statement that the defendant had better move his geese and ducks from a crate which Steve claimed belonged to him. Defendant took issue with Steve's claim of ownership and a fistfight broke out. Though disputed, there is evidence that the fight broke up when defendant stopped to take a shotgun from Mrs. Sikes.

Steve and his brother, Gary Johnson, who also lived at the Sikes home, left together to buy ammunition for a pistol Steve owned. When they returned to the Sikes home they were met by Mr. Sikes, who ordered them to leave and fired a shotgun to emphasize his order. As the Johnson boys left, Steve fired his pistol several times in the direction of defendant and the Sikes house. Thereafter, Mrs. Sikes went looking for the boys to "cool them down." Mr. Sikes took his shotgun and went to the barn some 70 to 100 feet from the house.

Steve and Gary Johnson returned to the Sikes home at "about 7:30 going on 8:00 o'clock" to get their clothing preparatory to moving from the house. No one else was there. Within a few minutes, Mrs. Sikes and Darlene returned home, and Steve and his mother got into another argument. Gary Johnson left and went next door to the Kennedy home.

Darlene Johnson and her mother testified that after Gary left, Steve fired several shots into a smokehouse, wounding several of the geese and ducks that were the subject of the earlier fist fight. Later, after passage of a time estimated to be "5 to 10 to 15 minutes," Darlene went into the backyard, saw Sikes with his shotgun climbing the fence near the house, and screamed "Mama, there's Jim." Mrs. Sikes ran out the back door. Steve ran out the front door. Shots were fired.

In giving his version of the shooting, defendant testified that he had gone to the barn and had stayed there for some considerable period of time after the last altercation with his stepson. He further testified that he heard his stepson return home. He heard the stepson fire some shots

around the house and overheard him quarreling with his mother and sister. The defendant then decided to go to the house to see what was going on. Instead of following the regular path, defendant cut across the pasture and climbed the fence at the side of the house. As he crossed the fence and started towards the house, Darlene Johnson came out the back door and started screaming " 'Oh, Mama, there's Jim.' So I seen Stevie go through the house and he said, 'Yeh, I see the son-of-bitch,' and about that time, he started out the front door and he shot either three or four times at me, and about the second or third time he shot, I fell flat on the ground beside of an old cellar we had and fired one time and I could not see him."

Darlene Johnson testified that she heard a shotgun blast, then several pistol shots, and a second shotgun blast. (Darlene Johnson's testimony on this point was shown to be contra to statements given by her earlier and with her testimony before the grand jury.)

Mrs. Sikes testified that she heard Steve shoot "3 or 4 times first."

Gary Johnson and Franklin Kennedy, a neighbor to the Sikes', testified they heard only two shotgun blasts, no pistol shots.

Steve Johnson was found some 70 feet from the house, "laying face down with his arms under him." He had been shot with shotgun pellets "in the left side of the back of the chest with a few pellets present on the back of the left hand and the back of the left upper arm." A pistol was removed from Steve's right hand front pants pocket by Gary Johnson, who testified there were no spent shells in the gun.

The investigating officer found two spent shotgun shells at the corner of the house where the defendant was standing when he fired at his stepson.

The medical examiner testified that the shotgun "pellets (that killed Steve) came directly from the rear of the deceased," and that the force of the pellets striking Steve would throw Steve "forward, either to the ground or nearly so." He also expressed the opinion that Steve could not put a pistol in his pocket after having been shot.

■ To convict a defendant of murder in the first degree, there must be an evidentiary basis for a conclusion by the jury that the killing was willful, deliberate, malicious and premeditated. Bass v. State, 191 Tenn. 259, 231 S.W.2d 707 (1950). All homicides are presumed to be malicious in the absence of evidence which would rebut the implied presumption. And, if a weapon is handled in a manner so as to make the killing a natural or probable result of such conduct, malice will be presumed from the use of the weapon. Gann v. State, 214 Tenn. 711, 383 S.W.2d 32 (1964); Morelock v. State, 3 Tenn.Crim.App. 292, 460 S.W.2d 861 (1970). Deliberation and premeditation involve a prior intention or design on the part of the defendant to kill, however short the interval between the plan and its execution. It is sufficient if only a moment of time elapses between the plan and its execution as long as the jury can conclude from the evidence that there was some appreciable interval, however small. And, whether premeditation is present in a given case is a question of fact to be determined by the jury from all circumstances of the case. Clarke v. State, 218 Tenn. 259, 402 S.W.2d 863 (1966).

■ In reviewing the evidence on which the jury predicates its finding of murder in the first degree to see if it supports a finding that the killing was willful, deliberate, malicious, and premeditated, this court must consider the evidence in the light of the rule that the credibility of the witnesses and the conflicts in their testimony have been settled by the verdict of the jury which has been approved by the trial court, and that any conflicts in the testimony have been resolved in favor of the jury's verdict. Osborne v. State, 512 S.W.2d 612 (Tenn.Cr. App.1974). Or, as stated by Mr. Justice

Chattin in Shiflet v. State, 216 Tenn. 365, 392 S.W.2d 676, 678 (1965),

"It is also an established rule the verdict of the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves any conflict in the testimony in favor of the insistence of the State. A verdict of the jury also removes the presumption of the innocence of the defendant; and, here, creates a presumption of his guilt and places the burden on him of showing the evidence preponderates against the verdict and in favor of his innocence. White v. State, 210 Tenn. 78, 356 S.W.2d 411 (1962); McBee v. State, supra, [213 Tenn. 15, 372 S.W.2d 173 (1963)]; Holt v. State, supra, [210 Tenn. 188, 357 S.W.2d 57 (1962)]."

 Considering the evidence in this case in the light of the above rule, we find that the defendant has failed to carry his burden of demonstrating that the evidence preponderates against the verdict of the jury that defendant was guilty of murder in the first degree. There is evidence that the defendant, who was not known to be on the premises, stealthily approached the house, carrying a shotgun loaded and ready to fire. The defendant, on seeing his stepson flee the house, fired two shots, one shot hit his stepson in the back, causing his death. The fact that the death weapon had to be manually "pumped" before it could be fired the second time is a strong indication of a wilful, deliberate intent to kill.

The defendant sought to escape punishment, or reduce it, by offering evidence tending to prove self-defense. However, by its verdict, the jury rejected this evidence and accepted instead evidence that the decedent fired no shots in his effort to escape. Having resolved the issue of credibility against defendant in his effort to prove self-defense, the jury was justified in finding, as they obviously did, that the defendant deliberately and premeditatedly shot Steve Johnson in the back as he fled from the Sikes' home, and thus was guilty of murder in the first degree.

Judgment affirmed.

FONES, C. J., and BROCK and HARBISON, JJ., concur.

HENRY, J., dissents.

HENRY, Justice (dissenting).

I respectfully dissent.

I agree with the factual recitation of the majority opinion but do not agree that they make out a case of first degree murder. Under this record one armed man shot another armed man after other shots had been fired by each, either at or in close proximity of the other.

As the majority points out, "the deceased had been the center of family controversy" for about four hours. He had cursed and abused his mother and had used ugly and profane language to her. He had discharged his pistol several times and, in a fit of temper, had even shot into a duck pen, killing at least one duck and wounding several others.

There is no escape from the conclusion that he had used up all his pistol ammunition and had left home shortly before the shooting for the sole purpose of purchasing more pistol ammunition. As a minimum, he was a "pistol toting" trouble maker.

In my view either the defendant or the deceased could have shot the other under a well-founded fear of death or the infliction of great bodily harm. It was inevitable that this "running fracas" would lead to bloodshed. This tragedy came as a result of their joint, mutual and concurrent criminal conduct. I am unwilling to visit upon the survivor of this duel in the dark the penalty of a first degree murder conviction and sentence.

Once the fact of the killing has been established, the law presumes that it was murder in the second degree. *Witt v.*

*State*, 46 Tenn. 5 (1868); *Shanklin v. State*, 491 S.W.2d 97 (Tenn.Cr.App.1972).

In my opinion, defendant was guilty of second degree murder.