RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0406P (6th Cir.)
File Name: 02a0406p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

PAUL GREGORY HOUSE,
   *Petitioner-Appellant,*

   *v.*      No. 00-6136

RICKY BELL, Warden,
   *Respondent-Appellee.*

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 96-00883—James H. Jarvis, District Judge.

Argued: June 12, 2002

Decided and Filed: November 22, 2002

Before: MARTIN, Chief Circuit Judge; MERRITT,
BOGGS, NORRIS, SILER, BATCHELDER,
DAUGHTREY, MOORE, COLE, CLAY, and GILMAN,
Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Stephen M. Kissinger, FEDERAL DEFENDER
SERVICES, Knoxville, Tennessee, for Appellant. Jennifer L.
Smith, OFFICE OF THE ATTORNEY GENERAL,
Nashville, Tennessee, for Appellee. **ON BRIEF:** Stephen
M. Kissinger, FEDERAL DEFENDER SERVICES,
Knoxville, Tennessee, for Appellant. Jennifer L. Smith,

1

OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, Michael E. Moore, Paul G. Summers, TENNESSEE ATTORNEY GENERAL'S OFFICE, CIVIL LITIGATION & STATE SERVICES DIVISION, Nashville, Tennessee, for Appellee.

MERRITT, J., delivered the opinion of the court, in which MARTIN, C. J., DAUGHTREY, MOORE, COLE, and CLAY, JJ., joined. BOGGS, J. (pp. 22-35), delivered a separate dissenting opinion, in which NORRIS, SILER, and BATCHELDER, JJ., joined. GILMAN, J. (p. 36-37), also delivered a separate dissenting opinion.

_____

**OPINION**

_____

MERRITT, Circuit Judge.   In this death penalty case from Tennessee, the habeas petitioner presents a strong claim of "actual innocence" or "miscarriage of justice," as we will outline below.  The Supreme Court has assumed that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant habeas relief *if there were no state avenue open to process such a claim*." *Schlup v. Delo* 513 U.S. 298, 314 n. 28 (1995)(*quoting Herrera v. Collins*, 506 U.S. 390, 417 (1993)(O'Connor, J., concurring)(emphasis added). Justice O'Connor has referred to such an execution as a "constitutionally intolerable event." 506 U.S. 417.  As a matter of traditional comity and respect for our colleagues on the Supreme Court of Tennessee, we therefore certify certain questions to that Court in order to ascertain whether there remains a "state avenue open to process such a claim" in this case.  In both capital and non-capital habeas cases, the United States Supreme Court has certified in similar situations important questions of state law which "would assist in framing the precise federal constitutional issues presented." *Zant v. Stephens*, 462 U.S. 862, 870 (1983).  For a recent certification by the Supreme Court to the Supreme Court of Arizona in a death case, *see*

*Stewart v. Smith*, 534 U.S. 157 (2001). We will follow that pattern of certification in this case.

The petitioner, Paul House, has been sentenced to death on the basis of a set of facts that now turns out to be false in significant respects. The prosecution's theory of the case, as argued and no doubt as accepted by the jury, was that House raped the victim and then concealed the rape by murdering her. DNA evidence has now conclusively shown that the semen introduced at House's trial to prove his sexual assault was not his semen but rather the semen of the victim's husband. In addition, two other significant events have occurred since the death penalty was imposed to cast doubt on the accuracy of the jury's verdict: first, the testimony of two independent witnesses that the victim's husband admitted that he, not the defendant, killed his wife; and second, the Assistant Chief Medical Examiner of the State of Tennessee has now concluded that the blood found on House's blue jeans was identical to the victim's blood in the vials obtained during autopsy and not consistent with blood that came from the victim at the time of the murder. As the Tennessee Supreme Court explained in reviewing House's conviction, House "never confessed to any part in the homicide, and the testimony linking him to it was circumstantial." *State v. House*, 743 S.W.2d 141, 143 (1987).

## I.

### *A. House's Trial*

The dead body of Carolyn Muncey, a resident of rural Union County, Tennessee, was found on the afternoon of July 14, 1985, lying partially concealed in a brush pile at the bottom of a wooded embankment within 100 yards of her home. The previous evening, Mrs. Muncey and her two children had visited a neighbor and left at about 9:30 p.m. to

return home. Muncey's older child, ten year old Laura,[1] testified at trial that she was awakened late that evening by the sound of a car horn. She testified that she heard a deep voice that sounded like her grandfather asking about her father. The same voice told her mother that her father had been in a car wreck near the creek. Laura further stated that she heard her mother sobbing or crying as she left the house. When her mother did not return, the two children went to look for her at neighboring homes. Not finding her, they returned home and waited until their father Hubert Muncey arrived. Discovering that his wife was missing, he took the children back to the home of the neighbor they had visited earlier and then called for members of his family to look for his wife.

When the body of Carolyn Muncey was discovered the next afternoon, she was dressed in her nightgown, housecoat, and underclothing. Her body had significant bruises, and there were abrasions indicating a physical struggle. There was also evidence of attempted strangulation. According to Dr. Carabia, a forensic pathologist, a blow to her left forehead resulting in a concussion and hemorrhage to the right side of her brain caused her death. Carabia also testified at trial that the victim was probably knocked unconscious by the blow to the head, and died within an hour or two. He estimated the time of her death as between 9 and 11 p.m. on Saturday, July 13, but emphasized that it was a rough estimate.

The testimonial evidence presented at trial implicated both the defendant and the victim's husband, Hubert Muncey. Muncey's alibi for the night of July 13 was that he spent the evening at the weekly C & C Recreation Center community dance and did not leave until midnight. Several individuals confirmed that he was at the dance, but no one confirmed his presence there late in the evening. The following morning Muncey went to the house of a neighbor, Artie Lawson, and

---

[1]Laura Muncey's name is spelled both with and without a "u" throughout the record. For the sake of consistency we are using the "Laura" spelling. She is also referred to by her married name, Laura Muncey Tharp.

In sum, I believe that there is no need to certify any questions to the Tennessee Supreme Court and this court should decide the issues currently before it on the merits. But I also disagree with Judge Boggs's interpretation of the *Schlup* standard and his resulting resolution of this case. Finding myself caught between Scylla and Charybdis (to say nothing of medieval angels and Foucault), I respectfully file this separate dissent.

---

**DISSENT**

---

RONALD LEE GILMAN, Circuit Judge, dissenting. Because I am not comfortable with either the majority opinion or Judge Boggs's dissent, I write separately to express my own views. Although I agree with the majority opinion that the petitioner presents a strong claim for habeas relief, at least at the sentencing phase of the case, I disagree with the decision to certify questions to the Tennessee Supreme Court. Judge Boggs lays out a cogent argument to the effect that the majority's questions are loaded with a number of unwarranted assumptions, the answers to which will not advance the ultimate resolution of this case. I therefore agree with Judge Boggs that this court can and should decide the case on the merits as it is currently before us.

Although I agree with Judge Boggs's rationale on the question of certification, I decline to join his conclusion that we should affirm the district court's opinion. I find particularly disturbing the notion that the defendant's entitlement to relief hinges on a hypothetical statistical analysis that attempts to find mathematical precision in an endeavor that in the end requires a judgment call based on a sound understanding of human nature. I agree with Judge Merritt's response on this point as expressed in footnote 4 of his opinion. Judge Boggs's conclusion that "an honest application of the *Schlup* standard means that a prisoner can meet it only if a judge can conscientiously assert that every reasonable juror is almost certain to vote to acquit" seems to me an overstatement of Justice Steven's language that the test is whether "it is more likely than not that no reasonable juror would have convicted." Judge Boggs's interpretation would make the *Schlup* standard virtually impossible for a defendant to meet. In my opinion, it is a misreading of the standard as articulated by the Supreme Court.

asked her to lie for him as an alibi witness and say that she had seen him at the dance around midnight. The record shows that at the time of the murder Mrs. Muncey and her husband had been having marital difficulties. He had been physically abusing her and she had been contemplating leaving him. Muncey's history of abusing his wife was well-known within the local community, and he acknowledged that he "smacked" his wife on more than one occasion.

The testimonial evidence presented at trial also implicated House. There was evidence showing that he was acquainted with Mr. and Mrs. Muncey and had been with them socially on a few occasions, but there was no evidence to indicate that House was aware of the Muncey's marital situation, or that there had been any previous romantic or sexual relationship between him and the victim.

In addition, on the day following the victim's disappearance, Billy Ray Hensley, a close friend of Hubert Muncey, saw Paul House on Ridgecrest Road near the site where Mrs. Muncey's body was later found concealed in the underbrush. According to Hensley, House emerged from the embankment where the body was found and was wiping his hands with a dark cloth. Hensley spoke briefly with House and left the scene. Later Hensley and a friend returned to the scene, and went to the point where he had purportedly seen House emerge from the embankment. Looking down the bank, they found the partially concealed body of Mrs. Muncey.

House admitted that he had been in the area but denied that he had seen the body of Mrs. Muncey or had any knowledge of its presence. In addition, the dark rag which he had been using when first seen was never produced. It was the theory of the State, however, that this was a dark tank top which House was shown to have been wearing on the previous evening. Hensley's testimony that he saw House emerging from the embankment was partially discredited at trial by his own statement that he saw House from about 500 feet down Ridgecrest Road, a location where the defense proved by

photographic evidence that it would have been impossible for House to have been seen down the embankment.

In the days following the homicide, House gave two statements to investigating officers in which he denied being involved in the homicide. In both of these statements he stated that he had been at the trailer of his girlfriend Donna Turner the entire evening of July 13 and that he had not left until the next afternoon when he went to look for Hubert Muncey after learning of the disappearance of the latter's wife. Ms. Turner initially corroborated his alibi, but later modified her testimony to state that he had been in the trailer until about 10:45 p.m. at which time he left to take a walk. She stated that he did not take her automobile.[2] When he returned an hour or so later, he was panting, hot and exhausted. He was no longer wearing either his blue tank top or his tennis shoes. The shoes were later found in an area different from the place where House told her he had lost them, but did not have blood stains on them. House told Ms. Turner that he had thrown away the navy blue tank top because it had been torn when he was assaulted by some persons who tried to kill him.

At trial, three key pieces of physical evidence implicated House. First, House had numerous scratches and bruises on his arms, hands and body, with an especially significant bruise on the knuckle of his right ring finger. House explained that these injuries had been sustained innocently earlier during the prior week, but when Ms. Turner was called as a witness, she said that she had not observed them prior to the evening of July 13.

Second, investigators discovered a pair of blue jeans that Paul House had been wearing on the night of the murder, in the bottom of the clothes hamper at Ms. Turner's trailer. These trousers were later determined to be bloodstained, and the State produced scientific evidence that the stains were

---

[2] House's mother also testified that he did not use her automobile that evening.

Contrary to the statements in the court's opinion, the question raised by this dissent is not whether this decision "will delay House's execution." (page 19) The question is whether it will unjustifiably delay reaching finality. I have no particular brief for this defendant's execution, or his exoneration, other than as the evidence in this case leads me to make a decision based on existing law. I do have a brief for the value of reaching finality of decision, a brief that has been eloquently explained by the Supreme Court in *McCleskey v. Zant*, 499 U.S. 467, 491-92 (1991). If the court is fully convinced that no avenues are available (contrary to *Workman v. State*), and if it is convinced, contrary to the above demonstration, that the *Schlup* standard can be met on this evidence, then it should simply say so. The mere invocation of the statement "better to be safe than sorry" (page 21) simply means that no decision should ever be made.

It is obvious that the court's opinion is undergirded by an evaluation of the evidence that would argue that very few, if any, reasonable jurors would find House guilty beyond a reasonable doubt. If the court would clearly hold that now, at least we would have a straightforward legal decision, albeit one subject to challenge on further review. But in this case, we have undertaken a novel diversionary process, and added a new and unjustified procedure for avoiding finality. This decision could be invoked by any court whenever a claim of actual innocence, however tenuous, is raised for the first time in federal court. I therefore respectfully dissent.

The majority's basic problem is that if the evidence introduced at the habeas hearing does not compel a belief in House's innocence of the crime of killing Ms. Muncey, then it does almost nothing to undermine the death sentence. Thus, the questions purporting to deal with the sentence independent of the crime seem to have no basis.

Finally, the first and third questions as stated at pages 17 and 18 do not even purport to address the supposedly crucial question of whether a state avenue is open to process a claim. Instead, they ask, in terms that assume that all of the relevant material is procedurally properly before some Tennessee court, does "the law" (1) "require a new sentencing hearing" and (3) "require a new trial?"

Question 2 does at least appear to address some possibly relevant question by asking whether the Tennessee Supreme Court's "review process now permit[s] it to remedy any error in the weighing process by the jury in light of newly discovered evidence?" However, beyond our invitation to the Supreme Court to "remedy any error . . . by the jury," the most the Tennessee Supreme Court could do would be to say that there are avenues for last-minute post-conviction petitions. This possibility has already been amply demonstrated in *Workman v. State*, 41 S.W.3d 100 (Tenn. 2001). There, a "petition for a writ of error coram nobis" was filed in state court two days before a scheduled execution, based on alleged new evidence purportedly showing actual innocence. *Id*. at 104. The Tennessee Supreme Court swept aside all procedural obstacles and directed consideration on the merits. *Id*. at 103. Thus, there is clearly no basis for a remand to see if the Tennessee Supreme Court can do what it has already done in an analogous case.

## VI

In short, the court's opinion today is a procedural muddle, leading to far greater future muddles, to little practical effect other than to add an additional layer of delay.

human blood having characteristics consistent with the blood of Mrs. Muncey and inconsistent with House's own blood. Scientific tests also showed that the fibers found on the clothing of the victim were blue jean fibers. Third, investigators found spots of semen stain on the victim's nightgown and underclothing. Scientific tests showed that the semen came from a so-called "secretor," a class of males whose semen contains evidence of their blood type. In addition, the State introduced evidence that Paul House was a "secretor" and that the semen found on the victim's underclothes was of the same blood type as House.

The State's theory at trial was that House had lured the victim out of her house late at night with the intention of raping her and murdered her in the process. To support their theory, the State introduced into evidence and then emphasized the semen evidence in order to promote a jury inference that House had raped her. At trial, in its closing rebuttal, the State presented the following argument concerning House's motive:

> Now you may have an idea why he did it. The evidence at the scene which seemed to suggest that he was subjecting the lady to some kind of indignity, why would you get a lady out of her house, late at night, in her night clothes, under the trick that her husband has had a wreck down by the creek? Why is it that you want to get her down by the creek?.... [I]t is either to keep her from telling what you have done to her, or it is that you are trying to get her to do something that she nor any mother on that road would want to do with Mr. House .... and you kill her because of her resistance.

Tr. Trans. Vol. IX, p. 1302-03. The semen evidence fit the State's theory of the murder. In light of the State's theory and the testimonial and physical evidence, the jury convicted Paul House of first-degree murder and sentenced him to death. Citing the prosecution's claim that the evidence showed that "on her nightgown and underclothing some spots of semen stain from a male secretor of the same general type as

appellant," the Tennessee Supreme Court upheld House's conviction and the imposition of the death penalty. 743 S.W.2d 143.

### B. Newly Discovered Evidence

At the habeas hearing in federal court, House presented three important pieces of newly discovered evidence not considered by the jury at trial. First, he showed that he did not rape the victim. At the habeas hearing, DNA expert Lisa Calandro offered undisputed evidence that eliminated House as a potential donor of the semen. Ms. Calandro concluded that, based on the DNA of the semen, the victim's husband was the donor of the semen. In addition, there was no other physical evidence supporting rape or attempted rape of the victim. There was no evidence of forced penetration, the victim's clothing was not ripped or removed, and there were no bruises on the victim indicating an attempted rape. The State seems now to concede these facts.

Second, there are two independent accounts of Hubert Muncey's confessing to killing his wife that were not considered by a jury, and the statement of a third witness that Muncey had threatened to kill his wife. At the habeas trial, defense witnesses Kathy Parker and Penny Letner both testified that in the days after his wife's death, Hubert Muncey confessed to accidentally killing his wife. They both stated that he was crying about his wife and her death saying that he didn't mean to do it. According to the witnesses, Muncey had come home from the dance and gotten into an argument with his wife. He said that he "smacked her and that she fell and hit her head." Adding further credence to their testimony was the statement of Hazel Miller at the habeas trial that Mr. Muncey told her that he was going to get rid of his wife a few months before her death.

Third, the blood evidence introduced at trial has been called into question by new evidence presented by the defendant at the habeas hearing. Four vials of blood were taken from the victim when an autopsy was performed after her death. The vials were sent to the FBI lab for analysis. Defense expert Dr.

is believed. Of course, if his evidence is believed, he didn't commit the crime at all, so the aggravating factors should not even be considered. If, on the other hand, he did commit the crime, then the strength of the evidence that purports to undermine the aggravating factors is itself demolished or greatly weakened.

The second question appears to be a demand that the Tennessee Supreme Court re-entertain a petition for post-conviction relief. It asks "in light of the new DNA evidence" (which has never been presented to the Tennessee courts), and in light of "the error in the presentation of the third aggravating factor" (a matter fully considered by the Tennessee Supreme Court), what is the state of Tennessee law? This is essentially asking the Tennessee court to render an advisory opinion based on a record that its processes and fact finders have not considered.

The third question continues boldly to assert that the "evidence disproves the state's theory that the defendant murdered the victim in the commission of a sexual assault." It purports to ask the Tennessee Supreme Court to consider "malice aforethought," but to do so "together with other newly discovered evidence of actual innocence." Again, the theories are in contradiction. If House did not commit any crime, then malice aforethought is irrelevant. If he did commit the crime, albeit without depositing semen on the victim's clothing, then it is extremely difficult to say that luring a person out of her bed and home in the middle of the night and murdering her in a way that results in her body being found "partially concealed in a brush pile at the bottom of a wooded embankment" 100 yards from her home (page 3, lines 3-5 of section I) does not permit some reasonable juror to find that there was malice aforethought. In particular, the statement from the court's opinion quoted above presents the facts much more fairly than the court's bland statement at page 11 that "[a]lthough House purportedly lured the victim out of her house, her body was found within yards of her doorstep. . . ."

away in order to confine her against her will. Not every reasonable juror would be likely to believe that he tricked her out of the house in order to discuss epistemology, and a sudden affray over Foucault caused him to kill her in a blind rage.

The third aggravating factor is the simplest: that House had previously been convicted of a felony "involving the use or threat of violence to a person." This item was amply proved by Utah state records showing House's conviction for aggravated sexual assault. The only error was that evidence was also introduced (truthfully) that he had been sentenced to five years to life for that offense, and was on parole. All that the Tennessee Supreme Court found was that the latter factual information was irrelevant. It certainly did not find that there was any prejudice by the introduction of such evidence. Since House was at liberty when the crime was committed, he must have either served out his sentence, escaped, or been on parole. Of the three, being on parole is the most benign interpretation of the evidence. Nor was the length of the sentence for this crime particularly prejudicial. Thus, the third aggravating factor has not been undermined to any significant degree.

V

I turn now to the specific questions that the court's opinion certifies to the Tennessee Supreme Court. It is frequently said, in response to a rhetorical question, that there are "smuggled assumptions" within a question – the unstated premises upon which the question rests. In this case, however, the assumptions have not been smuggled – they have been cleared through customs with all duties paid.

The first question specifically states that "a defendant whose sole *remaining* aggravating factor was introduced in an erroneous manner" is involved. (Emphasis added.) Of course, the destruction of the other factors is the very element that should be decided, not assumed. Indeed, as discussed above, the remaining aggravating factors are at most weakened, but not removed, even if the defendant's evidence

Cleland Blake, Assistant Chief Medical Examiner for the State of Tennessee, reached the conclusion that the blood on House's jeans came from one of the vials of blood taken from the victim's body, not from her body at the time of the murder. His conclusion was based on his theory of enzymatic degradation. When FBI Agent Paul Bigbee initially tested the blood from Ms. Muncey's body and the blood found on Paul House's jeans, he found a clear match, revealing that the blood on his jeans belonged to the victim. Blake, however, found that upon closer examination, there was consistency in enzyme degradation between the sample from Ms. Muncey's body and the five samples from the jeans.

Blake's testimony is as follows: enzymes are proteins which have a complex molecular structure. There are many types of enzymes which act as catalysts for cellular activity. Their fragile structure is only maintained by the proper environment provided in the human body. Over time, the chemical bonds of enzymes break and they lose their structure and shape and become inactive, i.e., they degrade and are said to be "denatured." Agent Bigbee performed tests on the victim's blood and the five samples from the defendant's jeans. Agent Bigbee looked for the presence of various enzymes -- to see whether they had denatured or not -- in the blood from the test. Of the ten enzymes tested, six had conclusive results. All six enzymes matched. Analyzing the results of Bigbee's tests, Dr. Blake concluded that the enzymes in the blood on the jeans changed shape and degraded at the same rate as the blood in the sample taken from the victim's body after her death. Because they degraded at the same rate despite being in two different media, it appears that the enzymes came from the same sample, that is, the blood on the defendant's jeans came from the one of the vials of blood taken from the victim. The blood on the jeans did not come from the victim at the time that she was assaulted.

In addition to the similarity in enzymatic activity, House presented evidence suggesting that the sample in the vials of blood may have been tampered with or spilled onto the blue

jeans. As Dr. Blake noted, there was no unbroken chain of custody. Larry Johnson, an expert in crime scene investigation, similarly stated that "the packaging of the materials in the case did not meet professional standards." House also showed that there was blood missing from the sample taken – one of the four vials was empty and another is only half-full despite Agent Bigbee's testimony that he used only one-fourth of a vial in performing his tests at the FBI lab. House then introduced the photograph of the styrofoam container clearly showing that blood spilled in the container and that the tape on the container was mysteriously cut and retaped contrary to standard procedure. The label on the container said it contained the semen and the blood evidence, but it turned out that the semen evidence was shipped separately. Also, House noted that the location of the blood spots on the jeans was odd. The five spots were found on the outside left leg, on the inside left thigh, on the *inside* right pocket, outside the right pocket, and on the right cuff, respectively.

The testimony of the State's blood spatter expert Pauline Sutton also raised questions as to whether the jeans were tampered with. She noted that some of the blood stains were mixed with mud. The National Weather Service records show that it had not rained for three days prior to the murder, and photographs of the crime scene showed no mud present. Lastly, there was no mud on the victim's nightgown. All of this evidence raises serious questions as to how the mud got on the jeans.

### C. Aggravating Factors

At sentencing, the jury found that the State proved three of the statutory aggravating factors. They were (1) the homicide was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death; (2) it was committed while House was committing or attempting to commit or fleeing from the commission of rape or kidnaping; and (3) House had previously been convicted of a felony involving the use or

. . . are true' whether a juror . . . . would vote to convict.'" (quoting *Schlup,* 513 U.S. at 331). That language is excerpted from the portion of *Schlup* that specifically makes that statement in the context of facts that "the Court of Appeals assumed [were true] for the purpose of applying its understanding of the *Sawyer* standard." *Ibid*. In other words, Justice Stevens was saying that *if* the reviewing court believed the new evidence to be true (while the Justice recognized that "those new statements may, of course, be unreliable") *then* the *Schlup* standard would be met. He certainly did not say that a reviewing court was required to find reliable any and all new evidence proffered.

Finally, it should be noted that this dissent does not state, contrary to page 21, that "all the questions before us" are fully exhausted. As is clearly stated at page 23, it is the underlying claim before us, "ineffective assistance of counsel," that is fully exhausted.

### IV

*The Aggravating Factors*.

The court's opinion also tries to use the allegedly new evidence to undermine the three aggravating factors found by the jury.

With regard to the first aggravating factor, our court's statement (page 11) that the primary evidence for the existence of "torture or serious physical abuse" was the evidence of rape is belied both by the state's failure specifically to argue that point, and by the extensive evidence of the physical beating and strangulation of the victim.

The second aggravating factor is that House committed the crime in the course of an attempted rape or kidnaping. Kidnaping includes "unlawfully . . . inveigling [or] enticing away another with the intent of causing him to be secretly confined or imprisoned against his will." Surely some reasonable juror would find that, if House committed the offense as described in the testimony, he enticed the victim

the exact language in *Schlup*. *That* opinion specifically says that "the standard requires the . . . court to make *a probabilistic determination about what* reasonable, properly instructed jurors would do." *Schlup*, 513 U.S. at 319 (emphasis added). Thus, the Supreme Court specifically requires us to make the type of determination that appears to upset the court. Further, the complaint in footnote 4 simply refuses to confront the fact that if *one juror*, acting reasonably, would have voted to "find him guilty beyond a reasonable doubt" then it is definitionally impossible to make the necessary determination, in the words of Justice Stevens, that "*no* juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Ibid.* (emphasis added). The fact that the court may consider such an argument to be "hypothetical," "medieval scholastic" or "remarkable" does not alter the words and holding in the Supreme Court's opinion.

### III

A careful reader will discern that a number of the significant criticisms of the dissent that are leveled in section III of the court's opinion do not correspond with what is actually written in the dissent. At page 19, the court's opinion states that I am applying "the old standard of the sufficiency of the evidence at trial." In fact, at pages 24-25, I consider the question in light of all the evidence, old and new, as I clearly state at page 26. Further a careful reader will find that I make no reference to the "any reasonable juror could convict" standard of *Jackson v. Virginia*, but rather rely solely on the holdings in *Schlup*.

The charges made at page 20 that "the test used by our dissenting colleagues [is] the sufficiency of the evidence in the trial record" and "whether there is evidence that could have supported a jury's decision to convict, regardless of the new evidence" are nowhere held, supported, nor implied in the dissent.

A careful reading of *Schlup* also belies the statement at page 20 that "the question is . . . 'if they [the new statements]

threat of violence to the person. T.C.A. §§ 39-13-204(i)(5), (7), and (2).

The undisputed DNA evidence that shows that House did not rape the victim seriously affects the first and second aggravating factors. The first aggravating factor states that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. The primary evidence for this aggravator that could constitute "torture" beyond the killing was the State's rape evidence.

The second aggravating factor alleged is that the crime was committed while House was committing or attempting to commit or fleeing from the commission of rape or kidnapping. In the jury instructions, the state trial court defined kidnapping as "the offense of forcibly or unlawfully confining, inveigling, enticing away another with the intent of causing him to be secretly confined or imprisoned against his will." Tr. Trans. at 1449. Although House purportedly lured the victim out of her house, her body was found within yards of her doorstep the following day. Outside of the evidence of sexual assault, the evidence that House confined or imprisoned the victim is remote. Thus, this aggravator is also undermined by the new DNA evidence.

In proving the third aggravating factor at the sentencing phase of the defendant's trial, the State introduced House's prior conviction by putting the defendant's parole officer, Guy Marney, on the stand. He testified that House was on parole, having been convicted in Utah of aggravated sexual assault. Marney also noted that the defendant's sentence had been from five years to life. On direct appeal, the Tennessee Supreme Court found that the admission of this evidence was error:

> In proving the prior conviction of the appellant at the sentencing hearing, the State adduced evidence as to the extent of his sentence and the fact that he was on parole. The State concedes that this testimony was irrelevant to any statutory aggravating circumstance or to any

mitigating factor and that error was, therefore, committed. Under all of the circumstances, however, in our opinion the error was harmless beyond a reasonable doubt. As previously stated, three aggravating circumstances were shown, and there was almost minimal proof of any mitigating factor, so that any error with respect to this issue, in our opinion, could not have affirmatively affected the results of the hearing.

*State v. House*, 743 S.W.2d 141, 147 (Tenn. 1987). Thus, the Court's opinion appears to preclude the use of this aggravator but allows the judgment to stand based on the rape evidence which was sufficient to establish the other two aggravators. The State had argued at its closing at sentencing that House's behavior was repetitive, having committed a prior sexual assault followed by the rape and murder of the victim:

And I say to you that if a person who does that [rapes and kills the victim], having been shown to have committed a violent crime, an aggravated sexual assault previously, then that is a person that in order to protect ourselves, we must consider the death penalty.

Tr. Trans. at 1437.

### D. The Effect of the DNA Evidence on the Element of "Malice Aforethought"

In addition to the questions raised by the DNA evidence concerning the aggravating factors, the DNA evidence raises a serious issue as to whether Paul House is guilty of first degree murder. At the time of the defendant's trial, Tennessee law defined murder as an unlawful killing "with malice aforethought, either express or implied." Tenn.Code Ann. §§ 39-2-201 (1982) [repealed]. If the murder was "perpetrated by means of poison, lying in wait, or by other kind of willful, deliberate, malicious and premeditated killing" or was committed during the commission of a felony, the killing constituted first degree murder. *Id.* at §§ 39-2-202(a) [repealed]. All other murders were deemed second degree murder. *Id.* at §§ 39-2-211(a) [repealed]. The

words of the *Schlup* decision, could determine that "no reasonable juror would have found the defendant guilty."

As a federal appellate court reviewing a federal habeas court's review of a state court's determination, and attempting to consider (as required by *Schlup*) what "any reasonable juror" (and thus *all* reasonable jurors) would do, we are *inevitably* making hypothetical judgments. That statement is as true of the majority and special dissenting opinions as it is of mine. But we *must* do that in order to be faithful to *Schlup*. Otherwise we are simply doing what some observers may think is done regularly in such cases — substituting our own judgment of what the evidence shows for the opinion of the jury, and of all jurors.

My mathematical analysis at pages 27-28 is *not* the main line of my analysis. As clearly stated at page 26, a claim such as House's fails *whenever* the reviewing judge can state a belief that some single reasonable juror would in fact still convict, taking into account all the new evidence (see page 26).

The mathematical analysis that so excites the court is simply the portion that goes beyond the statement above to indicate the reality of the meaning of the words that Justice Stevens penned. The standard is indeed a very difficult one to meet; it is not designed simply to allow judges to substitute their own judgment for that of some, or even most, jurors. As *Schlup* states: "It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses." 513 U.S. at 329.

That is all that my analysis attempts to explicate.

The fundamental error of footnote 4 is boldly stated when it complains that the dissent believes "that House should be executed" [more accurately, that his petition should be rejected on a proper application of the law] because "at least 1 hypothetical hold out juror would disagree" with the majority's implied opinion in this case. Any complaint with this statement simply betrays an unwillingness to face up to

reasonable degree of independence.[3]    Thus, an honest application of the *Schlup* standard means that a prisoner can meet it only if a judge can conscientiously assert that every reasonable juror is almost certain to vote to acquit. This case does not meet that standard.

In summary, in order to justify overturning a state court judgment, the *Schlup* standard "does not merely require a showing that a reasonable doubt exists in light of the new evidence, but rather that no reasonable juror would have found the defendant guilty." *Schlup*, 513 U.S. at 329. Footnote 4 of the court's opinion expresses the court's belief that House's sentence must be overturned if "even 50 of 100 . . . jurors would now seriously doubt the persuasiveness of the state's case." This statement is refreshingly candid, because it expresses what a careful reader might perceive to be the standard of many jurists in death penalty cases. However, it is as clear as the English language can make it that this is not the standard stated by Justice Stevens in the quotation above. The footnote clearly supports overturning a sentence in a situation (quite likely the situation in our case), where half of reasonable jurors would not, as the footnote says, "seriously doubt the persuasiveness of the state's case." In such a situation, I find it impossible to believe that a decision-maker, conscientiously reading the

---

[3]The mathematics is a bit complicated, but here is an example. If a group of 100 reasonable jurors each has a 10% likelihood of conviction, we can assess the degree of independence of each pair of jurors as follows:

1) If their opinions are wholly dependent, they will, of course, agree 100% of the time;
2) If their opinions are wholly independent, they would still agree 82% of the time. In our example, 81% of the time they would both acquit, 1% of the time they would both convict, and 18% of the time one would convict and one would acquit.

If their views are even a little bit independent, for example, if they now agree only 98% rather than 100% of the time, mathematics indicates that there is a very high likelihood, well beyond 50%, that at least one of the reasonable jurors would in fact vote to convict.

---

Tennessee Supreme Court further explained the elements of first-degree murder as follows:

> To convict a defendant of murder in the first degree, there must be an evidentiary basis for a conclusion by the jury that the killing was willful, deliberate, malicious and premeditated. All homicides are presumed to be malicious in the absence of evidence which would rebut the implied presumption. And, if a weapon is handled in a manner so as to make the killing a natural or probable result of such conduct, malice will be presumed from the use of the weapon. Deliberation and premeditation involve a prior intention or design on the part of the defendant to kill, however short the interval between the plan and its execution. It is sufficient if only a moment of time elapses between the plan and its execution as long as the jury can conclude from the evidence that there was some appreciable interval, however small. And, whether premeditation is present in a given case is a question of fact to be determined by the jury from all circumstances of the case.

*Sikes v. State*, 524 S.W.2d 483, 485 (Tenn.1975)(citations omitted). Thus, to convict a defendant of first-degree murder, the State must prove beyond a reasonable doubt that the defendant killed the victim, and did so with malice aforethought, premeditation, and deliberateness. *Id.*

The Tennessee Supreme Court has made it clear that when a jury makes "a determination of culpable mental states, such as premeditation ..., [it] must [often] be inferentially made from the circumstances surrounding the killing." *State v. Hall*, 958 S.W.2d 679, 704 (Tenn.1997). However, circumstantial evidence of a defendant's state of mind will not support a jury verdict of premeditated murder unless the proof of premeditation and deliberation is "so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." *State v. Crawford*, 225 Tenn. 478, 470 S.W.2d 610, 612 (1971). Motive directly impacts the question of premeditation and the

defendant's state of mind. *See, e.g.*, *State v. Schafer*, 973 S.W.2d 269, 273 (Tenn. Crim. App. 1997)(holding that the State had failed to prove premeditation because of its failure to prove motive).

The State argued at closing that the defendant's motive was to rape the victim and murder her in an attempt to conceal the rape. In disproving the rape, the DNA evidence introduced on habeas also undermines the State's only proffered motive for the crime and its stated basis for establishing the element of premeditation or malice aforethought necessary to prove first-degree murder. This evidence together with the new evidence of the husband's confessions and Blake's expert testimony appears to raise for House a strong claim of actual innocence of murder in the first degree.

## II.

Under current federal death penalty jurisprudence, a defendant's eligibility for the death penalty depends on a combination of federal and state law. One may not be condemned to death under the Eighth Amendment for simple murder. To survive Eighth Amendment scrutiny, there must be a "meaningful basis for distinguishing the few cases in which [death is to be] imposed from the many cases in which it [is] not." *Furman v. Georgia*, 408 U.S. 238, 313 (1972)(White, J., concurring).

This means that where simple murder is committed without any valid "aggravating" or similar class narrowing circumstance, death is cruel and unusual punishment. In order to be generally death eligible under the Eighth Amendment, the jury must find the defendant guilty of a valid "aggravating circumstance" that serves to distinguish those murderers who may deserve the death penalty from those who do not and thus "circumscribe the class of persons eligible for the death penalty." *See Barclay v. Florida*, 463 U.S. 939, 952-56 (1983); *Zant v. Stephens*, 462 U.S. 862, 877-78 (1983).

Without such a circumstance which renders the crime more culpable, a jury is left without sufficiently clear and definite

that *any* individual reasonable juror actually have a 50+ % probability of voting to convict. The standard requires only that we believe it to be more likely than not that *not a single one* of the aggregation of reasonable jurors who might have *some* inclination to vote for conviction would in fact do so. I will explain that difference.

If each person in a group of 100 reasonable jurors had a 10% likelihood of voting to convict the defendant, the outcome of the *Schlup* assessment would depend almost entirely on our belief about the independence of the jurors' judgments. By that, I mean that if each juror's opinion is independent of that of every other juror, it is almost certain that one out of the 100 jurors would convict.[2] If we believed that every juror thought exactly like every other one – that is, that their opinions had no independence at all, then there would be only a 10% chance of conviction by any juror in the whole group, and the *Schlup* standard would be met.

Thus, under these circumstances, the outcome of the *Schlup* assessment could turn on whether we believe there is any independence, or difference, in the thought processes of reasonable jurors. I believe that the experience of virtually every lawyer who has participated in a jury trial is that the thought processes of jurors have a considerable degree of independence. The reason that one juror may vote to convict (or to acquit) may differ significantly from that of other jurors. When that is the case, we have the following result. If any significant number of reasonable jurors have *some* likelihood of conviction, there is a very high probability that at least one such juror will in fact convict, given almost any

---

[2]The mathematics is such that the chance that no one of 100 independent jurors, each with a 10% probability of voting to convict, would convict, is .9 to the 100th power, which is less than 1 chance in 25,000.

set out in *Schlup v. Delo*.[1]  While various forms of words are used at different points in the opinion, the clearest statement appears at page 329, where Justice Stevens states that this extraordinary step is permitted only if we judge that "it is more likely than not that *no reasonable juror would* have convicted" the petitioner.  *Schlup*, 513 U.S. at 329 (emphasis added) (internal quotation marks omitted).  In making this judgment, *Schlup* "allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial."  *See Schlup*, 513 U.S. at 327-28, quoted in *Lott v. Coyle*, 261 F.3d 594, 621 (6th Cir. 2001) (Cole and Merritt, JJ.).  As Justice Stevens indicates, this is not the same as the standard in *Jackson v. Virginia*, 443 U.S. 307 (1979).  *Schlup*, 513 U.S. at 330.  This judgment is not limited to the evidence at the original trial, and it focuses on what "would" happen, rather than what constitutionally "could" happen.

Even so, this standard is still one that requires us conscientiously to consider the entire range of "reasonable" jurors.  In America, today, there are approximately 200 million persons eligible to serve as jurors.  Even with the numbers of statutory and other disqualifications, one would trust that the large majority of these persons are in fact reasonable. For petitioner to fail to meet the *Schlup* standard, we need only assess that one of those potential jurors has a 50+ % likelihood of convicting, considering all the new evidence. As the review of the evidence above shows, that is not a difficult judgment to make.  That judgment becomes even easier when the impact of the defendant's own incredible testimony at the habeas hearing is taken into account, as it must be.

However, the difficulty for a defendant seeking to satisfy this standard is even greater, for the standard does not require

---

[1]This assumes, of course, that we have already determined that there is no state avenue open to consider that claim further.  This is, of course, contrary to fact as shown by *Workman v. State*, 41 S.W.2d 100 (Tenn. 2001).  *See infra* at 34.

principles to insure that the death penalty is not arbitrarily and inconsistently applied in violation of the broad standards limiting the death penalty first laid down in *Furman*.  The guiding principle that emerged from *Furman* was that States were required to channel the discretion of sentencing juries in order to avoid a system in which the death penalty would be imposed in a "wanto[n]" and "freakis[h]" manner. *Id.*, at 310 (Stewart, J., concurring).

Since *Furman*, the Supreme Court has consistently insisted that there is a fundamental constitutional requirement  of channeling and limiting of the sentencer's discretion in imposing the death penalty in order to minimize sufficiently the risk of wholly arbitrary and capricious action.  *See, e.g., Gregg v. Georgia*, 428 U.S. 153, 189, 206- 207 (1976) (opinion of Stewart, Powell, and Stevens, JJ.); *id.*, at 220-222 (White, J., concurring in judgment); *Spaziano v. Florida*, 468 U.S. 447, 462 (1984); *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988).

In its most recent term, the Supreme Court held that "aggravating circumstances," the narrowing mechanism chosen by the State imposing the death penalty, are elements of the crime.  *See Ring v. Arizona*, 536 U.S. __, 122 S.Ct. 2428 (2002).  As a result, several important constitutional protections attach: "the proscription of any deprivation of liberty without 'due process of law' Amdt. 14, and the guarantee that '[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury,' Amdt. 6."  *United States v. Apprendi*, 530 U.S. 466, 476-77 (2000).  "Taken together, these rights indisputably entitle a criminal defendant to  'a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt."  *Id.* at 477 (*quoting United States v. Gaudin*, 515 U.S. 506, 510 (1995)).

The Supreme Court has established that the aggravating elements of the crime that make the accused eligible for the death penalty, like the elements of the underlying crime of

murder, depend on state law. *See Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)(holding that to be found actually innocent of the death penalty, a petitioner must show "by clear and convincing evidence that but for constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under applicable state law"). Tennessee law is clear that to be eligible for the death penalty as an initial matter, a jury must unanimously determine that one or more statutory aggravating circumstances have been proven by the State beyond a reasonable doubt. T.C.A. §39-13-204(g)(2002). Here, the jury found three. As explained above, new DNA evidence disproves the first two aggravating factors, and the Supreme Court of Tennessee held that the presentation of the third aggravating factor to the jury constituted prejudicial error.

The first unresolved question of state law is whether a defendant whose sole remaining aggravating factor was introduced in an erroneous manner loses his state defined eligibility for the death penalty based on that sentencing and requires a new sentencing hearing. In other words, in light of the United States Supreme Court's emphasis on the important constitutional protections accorded to a defendant to have aggravating circumstances proven to a jury beyond a reasonable doubt, does Tennessee law require that a defendant be resentenced where the only aggravating factor was presented in an erroneous and prejudicial manner? We also ask the Supreme Court of Tennessee whether, in light of the new DNA evidence and the error in the presentation of the third aggravating factor to the jury, Tennessee law requires that a jury reweigh the aggravating and mitigating circumstances in this case.

On the question of whether the defendant has made a "truly persuasive demonstration of actual innocence" of first degree murder, there arises a third unresolved question of state law. *Schlup*, 513 U.S. at 314, n. 28. As explained *supra*, the new DNA evidence disproves the State's theory that the defendant murdered the victim in the commission of a sexual assault. In light of the Tennessee Supreme Court's extensive

### 3. *Blood evidence.*

This is a convoluted scientific argument on behalf of an implication of a vast conspiracy on the part of Tennessee law enforcement officials. Simply put, the theory is that House never had any of the victim's blood on his jeans while the jeans were in his possession. Instead, blood from the victim's autopsy was smeared on the jeans in an elaborate charade designed to simulate the blood having been present when the jeans were found. This theory is based on a highly contested interpretation of abbreviations in the original scientific report, and on disputed interpretations of the amount and location of blood from certain vials after they had been transported. Again, in my view, some reasonable jurors would be likely to believe the direct testimony and evidence in preference to a disputed scenario requiring the perjurious cooperation of numerous government officials.

In addition, some reasonable jurors could (and at least one would) be persuaded by the strong circumstantial evidence presented at trial. Ms. Turner's testimony regarding House's absence during the crucial time surrounding the murder and his return in a disheveled condition is consistent with his committing the murder, and inconsistent with his defense theory. Finally, some reasonable juror, in assessing the strength of the new evidence, would agree with the district judge's finding that House's direct testimony, presented for the first time at the habeas hearing, lacked credibility.

## II

*The Schlup Standard.*

The appropriate standard for this court to employ in judging whether the evidence of House's "actual innocence" is so strong that we should consider his claim of ineffective assistance of counsel, regardless of his procedural default, is

that would allegedly be so powerful that the *Schlup* standard would be met. I will deal with each briefly.

### 1. *The semen on the victim's clothing.*

At trial, truthful evidence was presented showing that there were spots of semen on the victim's nightgown and underclothing (though none on or in her body) that were consistent with the physical characteristics of defendant House, though no claim was made that this proved identity. Nor, contrary to the majority's claim, did the State affirmatively contend that he had raped her. At most, as the quotation at page 7 of the majority opinion shows, the state argued that tricking a woman out of bed in the middle of the night and getting her down into a wooden ravine was consistent with "trying to get her to do something that she . . . would [not] want to do with Mr. House. . . ." Defense counsel noted at trial that the semen was equally consistent with the physical characteristics of the victim's husband who was, even then, an alternate suspect under the defense's theory.

### 2. *Muncey "confessions."*

At the habeas hearing, two women testified that Hubert Muncey confessed to killing his wife. These are statements made many years after the offense, by two women who knew the petitioner, that tend to exculpate him. The women were found not to be credible by the federal district judge. They were available to the defense at the time of trial, but either were not investigated, or were not deemed of sufficient use to call to testify. Finally, contrary to the implication at page 5 of the court's opinion, Artie Lawson did not testify at trial, but only at the habeas hearing. While these witnesses might convince some jurors (unlike the federal district judge), a juror need not be unreasonable to consider these statements to be last-minute fabrications in support of the defendant.

jurisprudence on "malice aforethought," we ask whether the DNA evidence, together with other newly discovered evidence of actual innocence, create a sufficient doubt that House is guilty of first degree murder that Tennessee law would require a new trial on the underlying murder charge.

Thus, we ask these questions, in light of *Schlup v. Delo*, *supra*, in order to ascertain whether there remains a "state avenue open to process [petitioner's] claim" of actual innocence in this case.

### ORDER CERTIFYING QUESTIONS TO THE SUPREME COURT OF TENNESSEE

Having now set out in detail the factual and legal basis of House's claim of actual innocence of the aggravating elements and of first degree murder and demonstrated that each are framed by rules of Tennessee state law, we respectfully certify to the Supreme Court of Tennessee under its certification rules,[3] the following two questions respecting the aggravating elements found by the jury and a third question concerning the underlying murder conviction:

(1) When the Tennessee Supreme Court finds error in the presentation of an aggravating factor to a jury, and the remaining aggravating factors are disproven by new DNA evidence, does a defendant lose his current eligibility for the death penalty under state law and require a new sentencing hearing?

(2) If under Tennessee law a jury must weigh the aggravating and mitigating circumstances, and the Supreme Court of Tennessee on review then proceeds to consider the reasonableness of the weighing process, does the Court's review process now permit it to remedy any error in the weighing process by the jury in light of newly discovered evidence?

---

[3] We certify this case pursuant to Rule 23, Rules of the S.Ct. of Tennessee.

We also respectfully certify to the Supreme Court of Tennessee one question concerning the "malice aforethought" element of the first degree murder conviction:

(3) Does Tennessee law require a new trial when newly discovered evidence of actual innocence, a significant part of which is in the form of DNA evidence which *could not be discovered* at the time of trial, creates a serious question or doubt that the defendant is guilty of first degree murder?

In accordance with Rule 23 of the Supreme Court of Tennessee, we provide the following required information:

(A) Style of the Case: *House v. Bell*, No. 00-6136

(B) Facts and questions of law: the facts out of which the questions of state law arise, and the questions themselves have been explained *supra*.

(C) The names of the parties: Paul Gregory House and Ricky Bell, Warden

(D) The names, addresses, and telephone numbers of counsel for both parties:

(1) Counsel for Paul House: Stephen M. Kissinger, Assistant Federal Community Defender, Federal Defender Services of Eastern Tennessee, Inc., 530 S. Gay St., Suite 900, Knoxville, TN 37902, 865-637-7979.

(2) Counsel for Ricky Bell: Paul G. Summers, Attorney General & Reporter; Michael E. Moore, Solicitor General; Alice B. Lustre, Assistant Attorney General; Glenn R. Pruden, Senior Counsel, Criminal Justice Division, P.O. Box 20207, Nashville, TN 37202, 615-741-3487.

(E) Designation of one of the parties as the moving party:

The Moving party (Petitioner): Paul House

The Adverse party (Respondent): Ricky Bell, Warden

avenue were open. However, those cases in no way open the door for a court of appeals, having squarely before it a claim (ineffective assistance of counsel) that is fully exhausted in the state courts, to ask a state court for a rumination on this question.

If the Tennessee Supreme Court answered this question, what would the result be? If it firmly states that there is *no* state avenue open, then we simply return to our current position, many months or years down the road, with our court forced at that point to confront the question that is actually before it now. On the other hand, if it declares that there *is* an avenue open to process such a claim, then I would presume that habeas should be denied on that basis alone, again many months down the road.

This would presumably raise the odd (and unseemly) spectacle of this court denying a habeas petition and the prisoner proceeding toward execution, with only the possibility (which he would have always had anyway) of some last-minute intervention by the state courts. *See Workman v. State*, 41 S.W.3d 100 (Tenn. 2001).

In reality, the court's decision this day seems primarily to be a fishing expedition, undertaken in the hope that the Tennessee Supreme Court will take us off the hook by re-assuming control of the case, under the majority's gentle guidance, or in the hope that we will, at a minimum, inject a significant additional amount of delay. Because I believe that we have squarely presented before us a question that we can answer, I respectfully dissent.

I

Judge Merritt has written an able argument on petitioner's behalf. That argument might convince some, or even most, reasonable jurors that Paul House is actually innocent or should not be convicted. It would not, however, be so compelling that it is more likely than not that no reasonable juror would convict and thus, under established law, it should not avail Mr. House. The court focuses on three new items

_____

**DISSENT**

_____

BOGGS, Circuit Judge, dissenting. In today's opinion, the court does *not* answer the one question that should be before it: "Would some reasonable juror believe that Paul House committed first degree murder and should be subject to the death penalty?" *See Schlup v. Delo*, 513 U.S. 298, 329 (1995). A negative conclusion must be supported by "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Id*. at 324. Since the court does not decide that question today (though it certainly strongly hints at an answer), I have no affirmative case to rebut. As I will show below, if that question were squarely decided today, one would have to truncate drastically the class of "reasonable jurors" to produce a negative answer.

Instead, the court gives the petitioner what he is seeking, a delay in execution, by a tactic that, if valid and sanctioned by the Supreme Court, would allow any court of appeals to duck its responsibility to decide cases, in favor of returning them to state courts through a process that is without precedent.

The court's opinion attempts to find a precedent for such certification in cases such as *Stewart v. Smith*, 534 U.S. 157 (2001) and *Zant v. Stephens*, 462 U.S. 862, 870 (1983). These cases are not really on point; they involved situations in which the Supreme Court sought to understand more precisely the import of a challenged state law that had been interpreted by federal courts of appeals. In our case, the certified questions ask to have light shed on an issue already before us, whether "there [is] no state avenue open to process such a claim [of actual innocence]." *See Schlup*, 534 U.S. at 314 n.28 (*quoting Herrera v. Collins*, 506 U.S. 390, 417 (1988) (O'Connor, J., concurring)). *Ibid*. Apparently a federal court would not be warranted in granting habeas relief, even making all the other necessary assumptions, if such an

Accordingly, it is ORDERED that the above questions be certified to the Tennessee Supreme Court and forwarded to the clerk of the Tennessee Supreme Court under Rule 23, Rules of S.Ct. of Tennessee.

### III.  Response to Dissenting Opinion

Our dissenting colleagues' opinion makes two basic points repeatedly: (1) although the new evidence "might convince some, or even most, reasonable jurors that Paul House is actually innocent" (page 23), some juror might still conclude, even in light of the new evidence, that Paul House should be executed, and (2) the certification of questions to the Tennessee Supreme Court is merely a "novel diversionary process" that will delay House's execution.

With respect to the first point, our dissenting colleagues misunderstand Justice Stevens' opinion for the Court in *Schlup v. Delo*, 513 U.S. 298 (1995). In that case, the Court rejected the old narrow standard of *Jackson v. Virginia*, 443 U.S. 307 (1979), and *Sawyer v. Whitley*, 505 U.S. 333 (1992), in actual innocence cases like this one presenting new evidence. That is why Chief Justice Rehnquist and Justice Scalia dissented. Our dissenting colleagues in this case would apply the old standard of the sufficiency of the evidence at trial to new evidence that indicates that the capital defendant may be legally innocent.

In *Schlup*, it turned out that the Court's reversal saved Schlup's life. He was found to be innocent of the crime. Had the Court followed the standard proposed by our dissenting colleagues, the Eighth Circuit would have been affirmed, there would have been no "delay" to review the new evidence and Schlup would have been executed. For a description of Lloyd Schlup's case and the cases of numerous other condemned prisoners, whose convictions were set aside after numerous levels of trial and appellate review were exhausted, *see* James S. Liebman, et al., *A Broken System, Part II: Why There Is So Much Error in Capital Cases, and What Can Be Done About It*, 24-35 & notes 128-132 (Feb. 11, 2002).

The question is not, as our dissenting colleagues seem to believe, whether the trial evidence with the new information remains sufficient for a juror to vote to convict but rather "if they [the new statements] . . . are true," whether "a juror, conscientiously following the judge's instruction requiring proof beyond a reasonable doubt, would vote to convict." 513 U.S. at 331. This is far different from the test used by our dissenting colleagues — the sufficiency of the evidence in the trial record. The dissent looks to whether there is evidence that could have supported a jury's decision to convict, regardless of the new evidence. But *Schlup* looks instead to the "likely behavior of the trier of fact" — what a conscientious juror *would* do given all the evidence. Justice Stevens specifically holds, in reversing the Eighth Circuit, that "petitioner's showing of innocence is not insufficient solely because the trial record contained sufficient evidence to support the jury's verdict." *Id.*[4]

---

[4] Judge Boggs has added a lengthy argument based on his statistical and mathematical juror analysis designed to prove scientifically his belief that "it is almost certain that one out of the 100 jurors would [still] convict" House, even in light of the new evidence (see paragraph 21 and footnotes 2 and 3 of the dissenting opinion). Judge Boggs then seems to assert that House should be executed and there should be no certification of questions apparently because of his belief that at least 1 hypothetical hold out juror would disagree with the other 99 on House's case. This is a remarkable judicial argument that Judge Boggs somehow derives from Justice Stevens' opinion in *Schlup v. Delo.*

In no way, however, does Justice Stevens' holding in *Schlup* suggest that courts should engage in this kind of reasoning — akin to medieval scholastic argumentation about how many hypothetical angels, or hypothetical minds, can sit on the head of a pin and disagree. Justice Stevens' opinion does not require unanimity among some hypothetical number of hypothetical juridical minds. It is an opinion designed to deal with real situations presenting new evidence of actual innocence in death cases. Scholastic arguments aside, surely no one would really hold the view that House should be executed if 99 of 100, or even 50 of 100, jurors would now seriously doubt the persuasiveness of the state's case. In the real world of nonhypothetical juridical minds, only a new trial with real jurors will resolve such a problem.

With respect to the question of "delay," it is better to be safe than sorry, as we learned after Lloyd Schlup's case was reversed. We must remember, as members of the Supreme Court have advised us, that "death is different — that "[t]he taking of life is irrevocable," so that "[i]t is in capital cases especially that the balance of conflicting interests must be weighed most heavily in favor of the procedural safeguards of the Bill of Rights," *Reid v. Covert*, 354 U.S. 1, 45-46 (1957), (Frankfurter, J. concurring), and that "[i]n death cases doubts . . . should be resolved in favor of the accused," *Andres v. United States*, 333 U.S. 740, 752 (1948), and that "[t]he Court . . . has recognized that the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." *California v. Ramos*, 463 U.S. 992, 998-99 & n.9 (1983).

We must take seriously the Supreme Court's admonition in *Schlup*, quoted above, that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant habeas relief *if there were no state avenue open to process such a claim*," 513 U.S. 298, 314 n. 28. In such cases as this one, it is not obvious what avenues of relief are open, and we are not inclined to agree with our dissenting colleagues that the door should be closed and the man executed without asking any questions.

One further error in the dissenting opinion should be noted. The dissenters say that all the questions before us are "fully exhausted in the state courts." This is simply wrong. The DNA semen evidence has not been presented to state courts. Neither has the husband's confessions nor the conclusion of the Chief Medical Examiner for the State of Tennessee that the blood found on House's pants leaked from vials of blood from the autopsy of the victim. Had the Tennessee Supreme Court considered this evidence and decided that no avenues of relief are open in the courts of Tennessee, we would not be certifying the case to it.